## *In re* ROSS, Petitioner.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF NEW YORK.

No. 1683. Argued April 30, May 1, 1891. — Decided May 25, 1891.

By the Constitution of the United States a government is ordained and established " for the United States of America," and not for countries outside of their limits; and that Constitution can have no operation in another country.

The laws passed by Congress to carry into effect the provisions of the treaties granting exterritorial rights in Japan, China, etc. (Rev. Stat. §§ 4083–4096), do no violation to the provisions of the Constitution of the United States, although they do not require an indictment by a grand-jury to be found before the accused can be called upon to answer for the crime of murder committed in those countries, or secure to him a jury on his trial.

The provision in Rev. Stat. § 4086, that the jurisdiction conferred upon ministers and consuls of the United States in Japan, China, etc., by §§ 4083, 4084 and 4085, shall " be exercised and enforced in conformity with the laws of the United States," gives to the accused an opportunity of examining the complaint against him, or of having a copy of it, the right to be confronted with the witnesses against him, and to cross-examine them, and to have the benefit of counsel, and secures regular and fair trials to Americans committing offences there, but it does not require a previous presentment or indictment by a grand jury, and does not give the right to a petit jury.

The jurisdiction given to domestic tribunals of the United States over offences committed on the high seas in the district where the offender may be found, or into which he may be first brought, is not exclusive of the jurisdiction of a consular tribunal in Japan, China, etc., to try for a similar offence, committed in a port of the country in which the tribunal is established, when the offender is not taken to the United States.

Article IV of the treaty of June 17, 1857, with Japan is still in force, notwithstanding the provisions in Article XII of the treaty of July 29, 1858.

When a foreigner enters the mercantile marine of a nation, and becomes one of the crew of a merchant vessel bearing its flag, he assumes a temporary allegiance to the flag, and, in return for the protection afforded

him, becomes subject to the laws by which that nation governs its vessels and seamen.

A law or treaty should be construed so as to give effect to the object designed, and to that end all its provisions must be examined in the light of surrounding circumstances.

The fact that a vessel is American is evidence that seamen on board are Americans also.

When a person convicted of murder accepts a "commutation of sentence or pardon" upon condition that he be imprisoned at hard labor for the term of his natural life, there can be no question as to the binding force of the acceptance.

The petitioner below, the appellant here, was imprisoned in the penitentiary at Albany in the State of New York. He was convicted on the 20th of May, 1880, in the American consular tribunal in Japan, of the crime of murder, committed on board of an American ship in the harbor of Yokohama in that empire, and sentenced to death.

On the 6th of August following his sentence was commuted by the President to imprisonment for life in the penitentiary at Albany, and to that place he was taken and there he has ever since been confined. Nearly ten years afterwards, on the 19th of March, 1890, he applied to the Circuit Court of the United States for the Northern District of New York for a writ of *habeas corpus* for his discharge, alleging that his conviction, sentence and imprisonment were unlawful, and stating the causes thereof and the attendant circumstances. The writ was issued, directed to the superintendent of the penitentiary, who made return that he held the petitioner under the warrant of the President, of which a copy was annexed, and was as follows:

"Rutherford B. Hayes, President of the United States of America, to all to whom these presents shall come, Greeting:

"Whereas John M. Ross, an American seaman on board of the American ship 'Bullion,' was, on the 20th day of May, 1880, convicted of the crime of murder, committed on board the said ship 'Bullion,' then in the harbor of Yokohama, Japan, before Thomas B. Van Buren, Esquire, consul general

of the United States at Kanagawa, Japan, holding court at that place, and was by said consul general on such conviction aforesaid, in pursuance and by authority of the statutes of the United States to that end made and provided, sentenced to be hanged, ' at such time and place as the United States minister in Japan may direct, according to law ; '

" And whereas Mr. Bingham, the United States minister aforesaid, on the 22d of May following, approved the proceedings, verdict and sentence ;

" And whereas the said minister has postponed the execution of sentence, believing the ends of justice demand it, and has submitted the record of the case to the Department of State for the President's consideration and for commutation of sentence or pardon, if deemed advisable ;

" And whereas the President, upon a careful consideration of the facts and circumstances of the case as they were presented in the record of the proceedings and by a report from the Secretary of State, has arrived at the conclusion that the ends of justice will be fulfilled by the infliction of a less severe punishment than that of death :

" Now, therefore, be it known that I, Rutherford B. Hayes, President of the United States of America, in consideration of the premises, divers other good and sufficient reasons also me thereunto moving, do hereby pardon the said John M. Ross on condition that the said John M. Ross be imprisoned at hard labor for the term of his natural life in the Albany penitentiary, in the State of New York.

" This order will be carried into effect under the direction of the Secretary of State.

" In testimony whereof I have hereunto signed my name and caused the seal of the United States to be affixed.

" Done at the city of Washington this sixth day of August, A.D. 1880, and of the Independence of the United States the one hundred and fifth.

" [SEAL.]                              R. B. HAYES.

" By the President :

    " WM. M. EVARTS, *Secretary of State.*"

To this warrant was annexed a copy of the petitioner's acceptance of the conditional pardon of the President, certified to be correct by the United States consul general at Japan. It was as follows:

"I, John M. Ross, the person named in the warrant of conditional pardon granted to me by the President of the United States of America, dated the sixth day of August, 1880, and of which the foregoing is a correct copy, do hereby acknowledge the delivery of said original warrant of conditional pardon to me, and do hereby voluntarily and without qualification accept said conditional pardon with the condition thereof as therein stated, to wit, that 'I, Rutherford B. Hayes, President of the United States of America, etc., etc., do hereby pardon the said John M. Ross on the condition that the said John M. Ross be imprisoned at hard labor for the term of his natural life in the Albany penitentiary, in the State of New York.'

"JOHN M. Ross.

"Kanagawa, Yokohama, Japan, February 28th, 1881.
"Witness: THOS. B. VAN BUREN,
        *U. S. Consul General.*"

The case was then heard by the Circuit Court, counsel appearing for the petitioner and the assistant United States attorney for the government. On the hearing, a copy of the record of the proceedings before the consular tribunal, and of the communications by the consul general to the state department respecting them, on file in that department, was given in evidence. No objection was made to its admissibility.

The facts of the case as thus disclosed, so far as they were deemed material to the decision of the questions presented, were substantially as follows:

On the 9th of May, 1880, the appellant, John M. Ross, was one of the crew of the American ship Bullion, then in the waters of Japan, and lying at anchor in the harbor of Yokohama. On that day, on board of the ship, he assaulted Robert Kelly, its second mate, with a knife, inflicting in his neck a mortal wound, of which in a few minutes afterwards he died

on the deck of the ship. Ross was at once arrested by direction of the master of the vessel and placed in irons, and on the same day he was taken ashore and confined in jail at Yokohama. On the following day, May 10, the master filed with the American consul general at that place, Thomas B. Van Buren, a complaint against Ross, charging him with the murder of the mate. It contained sufficient averments of the offence, was verified by the oath of the master, and to it the consul general appended his certificate that he had reasonable grounds for believing its contents were true. The complaint described the accused as one "supposed to be a citizen of the United States."

On the 18th of that month an amended complaint was filed by the master of the ship with the consul general, in which the accused was described as "an American seaman, duly and lawfully enrolled and shipped and doing service as such seaman on board the American ship Bullion." The complaint was also amended in some other particulars. It was as follows:

"U. S. Consular General Court, Kanagawa, Japan.

"*Amended Complaint.*

"John P. Reed, master of the American ship 'Bullion,' on oath complains that John Martin Ross, an American seaman, duly and lawfully enrolled and shipped and doing service as such seaman on board the American ship 'Bullion,' did on the early morning of the 9th day of May, 1880, on board of said ship, while lying in the harbor of Yokohama, Japan, and within the jurisdiction of this court, with force and arms, maliciously, feloniously, deliberately, wilfully and of his malice aforethought, make an assault upon one Robert Kelly, the mate of said ship, and did then and there feloniously, maliciously, deliberately and of malice aforethought, strike and cut the said Robert Kelly with a knife, from which said Robert Kelly died on board said ship a short time thereafter. Wherefore affiant charges that said John Martin Ross wilfully and maliciously killed and murdered the said Robert Kelly,

OCTOBER TERM, 1890.

and affiant further says that said John Martin Ross is still a seaman on said ship.

"J. P. REED.

"Sworn and subscribed before me this 18th day of May, 1880.

"THOS. B. VAN BUREN,

"*U. S. Consul General.*"

To this amended complaint was annexed a certificate of the consul general that he had reasonable grounds for believing its contents to be true, similar to the one to the original complaint.

Previously to its being filed the accused appeared with counsel before the consul general, and the complaint being read to him, he presented an affidavit stating that he was a subject of Great Britain, a native of Prince Edward's Island, a dependency of the British Empire, and had never renounced the rights or liabilities of a British subject or been expatriated from his native allegiance or been naturalized in any other country. Upon this affidavit he contended that the court was without jurisdiction over him, by reason of his being a subject of Great Britain, and he prayed that he be discharged. His contention was termed in the record a demurrer to the complaint.

The court held that as the accused was a seaman on an American vessel, he was subject to its jurisdiction, and overruled the objection. The counsel of the accused then moved that the charge against him be dismissed, on the ground that he could not be held for the offence except upon the presentment or indictment of a grand jury, but this motion was also overruled.

Four associates were drawn, as required by statute and the consular regulations, to sit with the consul general on the trial of the accused, and, being sworn to answer questions as to their eligibility, the accused stated that he had no questions to ask them on that subject. They were then sworn in to try the cause "in accordance with court regulations." A motion for a jury on the trial was also made and denied. The

amended complaint was then substituted in place of the original, to which no objection was interposed, and to it the accused pleaded "not guilty," and asked for the names of the witnesses for the prosecution, which were furnished to him. The witnesses were then sworn and examined, and they established beyond all possible doubt the offence of murder charged against the accused, which was committed under circumstances of great atrocity. The court found him guilty of murder, and he was sentenced to suffer death in such manner and at such time and place as the United States minister should direct. The conviction and sentence were concurred in by the four associates, and were approved by Mr. Bingham, the minister of the United States in Japan. The minister transmitted the record of the case to the Department of State for the consideration of the President, and for commutation of the sentence or pardon of the prisoner, if deemed advisable. The President subsequently directed the issue to the prisoner of a pardon on condition that he be imprisoned at hard labor for the term of his natural life in the penitentiary at Albany, and it was accepted by him on that condition. His sentence was accordingly commuted, and he was removed to the Albany penitentiary.

The Circuit Court, after hearing argument of counsel and full consideration of the subject, made an order on January 21, 1891, denying the motion of the prisoner for his discharge, and remanding him to the penitentiary and the custody of its superintendent. 44 Fed. Rep. 185. From that order the case was brought here on appeal.

*Mr. George W. Kirchwey*, for appellant, made the following points:

I. The crime having been committed on board an American vessel, although such vessel was lying in the harbor of Kanagawa, Japan, was not committed within the territorial jurisdiction of the Consular General Court of Kanagawa, but within that of the United States. It was cognizable only by the domestic tribunals of the United States.

*First.* The Consular General Court, being a court of special and limited jurisdiction, has no powers save such as are expressly conferred by the treaty and statutes to which it owes its origin. These expressly confine its jurisdiction to the territorial limits of Japan.

*Second.* The domestic jurisdiction of the modern State extends to crimes committed upon private as well as public vessels of the State upon the high seas. For the purposes of this jurisdiction, a foreign port is regarded as being within the high seas, and the ship as a part of the territory of the State to which she belongs.

*Third.* The original and domestic jurisdiction of the Federal courts being adequate to deal with cases of this kind, it will not be presumed that the Congress intended to set up a novel jurisdiction of limited and inferior character, to supersede or compete with the former.

*Fourth.* The mode in which the jurisdiction of the United States in such cases must be exercised is prescribed by statute. It is expressly provided that all crimes committed on American vessels on the high seas shall be tried within the United States.

II. If it be claimed that the offence in question was committed in Japan, and not upon the high seas, the consular jurisdiction of the United States is wholly excluded by the fact that the record does not disclose facts conferring jurisdiction under the treaties and laws.

*First.* The treaties of the United States with Japan, and the laws passed by Congress in pursuance thereof, expressly restrict the jurisdiction of the consular courts to citizens of the United States. It does not appear that Ross was a citizen of the United States.

*Second.* The statutes creating the consular courts, as well as the treaties under which they are instituted, and from which they derive such authority and jurisdiction as they possess, expressly subject that jurisdiction to the laws of the United States.

*Third.* The claim that the Constitution has no extraterritorial force is disproved by the existence and operation of the consular court itself.

III.　The refusal to allow the accused a trial by jury was a fatal defect in the jurisdiction exercised by the court, and renders its judgment absolutely void.

 *First.*　The jury contemplated by the Constitution (Art. III, § 2, subd. 3; amendments, Art. VI), and demanded by the appellant, is a common law jury of twelve men.

.　*Second.*　There appears to be nothing in the legislation of Congress relating to the exercise of this consular jurisdiction to preclude compliance with the constitutional requirement.

*Mr. Assistant Attorney General Parker* for appellee.

Mr. Justice Field, after stating the case, delivered the opinion of the court.

The Circuit Court did not refuse to discharge the petitioner upon any independent conclusion as to the validity of the legislation of Congress establishing the consular tribunal in Japan, and the trial of Americans for offences committed within the territory of that country, without the indictment of a grand jury, and without a trial by a petit jury, but placed its decision upon the long and uniform acquiescence by the executive, administrative and legislative departments of the government in the validity of the legislation.　Nor did the Circuit Court consider whether the status of the petitioner as a citizen of the United States, or as an American within the meaning of the treaty with Japan, could be questioned, while he was a seaman of an American ship, under the protection of the American flag, but simply stated the view taken on that subject by the Minister to Japan, the State Department, and the President.　Said the court : "During the thirty years since the statutes conferring the judicial powers on ministers and consuls, which have been referred to, were enacted, that jurisdiction has been freely exercised.　Citizens of the United States have been tried for serious offences before these officers, without preliminary indictment or a common law jury, and convicted and punished.　These trials have been authorized by the regulations, orders and decrees of ministers, and it.

must be presumed that the regulations, orders and decrees of ministers prescribing the mode of trial have been transmitted to the Secretary of the State, and by him been laid before Congress for revision, as required by law. Unless the petitioner was not properly subject to this jurisdiction because he was not a citizen of the United States, his trial and sentence were in all respects modal, as well as substantial, regular and valid under the laws of Congress, according to the construction placed upon these statutes by the acquiescence of the executive, administrative and legislative departments of the government for this long period of time."

Under these circumstances the Circuit Court was of opinion that it ought not to adjudge that the sentence imposed upon the petitioner was utterly unwarranted and void, when the case was one in which his rights could be adequately protected by this court, and when a decision by the Circuit Court setting him at liberty, although it might be reversed, would be practically irrevocable.

The Circuit Court might have found an additional ground for not calling in question the legislation of Congress, in the uniform practice of civilized governments for centuries to provide consular tribunals in other than Christian countries, or to invest their consuls with judicial authority, which is the same thing, for the trial of their own subjects or citizens for offences committed in those countries, as well as for the settlement of civil disputes between them; and in the uniform recognition, down to the time of the formation of our government, of the fact that the establishment of such tribunals was among the most important subjects for treaty stipulations. This recognition of their importance has continued ever since, though the powers of those tribunals are now more carefully defined than formerly. *Dainese* v. *Hale*, 91 U. S. 13.

The practice of European governments to send officers to reside in foreign countries, authorized to exercise a limited jurisdiction over vessels and seamen of their country, to watch the interests of their countrymen and to assist in adjusting their disputes and protecting their commerce, goes back to a very early period, even preceding what are termed the Mid-

dle Ages.  During those ages these commercial magistrates, generally designated as consuls, possessed to some extent a representative character, sometimes discharging judicial and diplomatic functions.  In other than Christian countries they were, by treaty stipulations, usually clothed with authority to hear complaints against their countrymen and to sit in judgment upon them when charged with public offences.  After the rise of Islamism, and the spread of its followers over eastern Asia and other countries bordering on the Mediterranean, the exercise of this judicial authority became a matter of great concern.  The intense hostility of the people of Moslem faith to all other sects, and particularly to Christians, affected all their intercourse, and all proceedings had in their tribunals.  Even the rules of evidence adopted by them placed those of different faith on unequal grounds in any controversy with them.  For this cause, and by reason of the barbarous and cruel punishments inflicted in those countries, and the frequent use of torture to enforce confession from parties accused, it was a matter of deep interest to Christian governments to withdraw the trial of their subjects, when charged with the commission of a public offence, from the arbitrary and despotic action of the local officials.  Treaties conferring such jurisdiction upon these consuls were essential to the peaceful residence of Christians within those countries and the successful prosecution of commerce with their people.

The treaty-making power vested in our government extends to all proper subjects of negotiation with foreign governments. It can, equally with any of the former or present governments of Europe, make treaties providing for the exercise of judicial authority in other countries by its officers appointed to reside therein.

We do not understand that any question is made by counsel as to its power in this respect.  His objection is to the legislation by which such treaties are carried out, contending that, so far as crimes of a felonious character are concerned, the same protection and guarantee against an undue accusation or an unfair trial, secured by the Constitution to citizens of the United States at home, should be enjoyed by them abroad.

In none of the laws which have been passed by Congress to give effect to treaties of the kind has there been any attempt to require indictment by a grand jury before one can be called upon to answer for a public offence of that grade committed in those countries, or to secure a jury on the trial of the offence. Yet the laws on that subject have been passed without objection to their constitutionality. Indeed, objection on that ground was never raised in any quarter, so far as we are informed, until a recent period.

It is now, however, earnestly pressed by counsel for the petitioner, but we do not think it tenable. By the Constitution a government is ordained and established "for the United States of America," and not for countries outside of their limits. The guarantees it affords against accusation of capital or infamous crimes, except by indictment or presentment by a grand jury, and for an impartial trial by a jury when thus accused, apply only to citizens and others within the United States, or who are brought there for trial for alleged offences committed elsewhere, and not to residents or temporary sojourners abroad. *Cook* v. *United States*, 138 U. S. 157, 181. The Constitution can have no operation in another country. When, therefore, the representatives or officers of our government are permitted to exercise authority of any kind in another country, it must be on such conditions as the two countries may agree, the laws of neither one being obligatory upon the other. The deck of a private American vessel, it is true, is considered for many purposes constructively as territory of the United States, yet persons on board of such vessels, whether officers, sailors, or passengers, cannot invoke the protection of the provisions referred to until brought within the actual territorial boundaries of the United States. And, besides, their enforcement abroad in numerous places, where it would be highly important to have consuls invested with judicial authority, would be impracticable from the impossibility of obtaining a competent grand or petit jury. The requirement of such a body to accuse and to try an offender would, in a majority of cases, cause an abandonment of all prosecution. The framers of the Constitution, who were fully

aware of the necessity of having judicial authority exercised by our consuls in non-Christian countries, if commercial intercourse was to be had with their people, never could have supposed that all the guarantees in the administration of the law upon criminals at home were to be transferred to such consular establishments, and applied before an American who had committed a felony there could be accused and tried. They must have known that such a requirement would defeat the main purpose of investing the consul with judicial authority. While, therefore, in one aspect the American accused of crime committed in those countries is deprived of the guarantees of the Constitution against unjust accusation and a partial trial, yet in another aspect he is the gainer, in being withdrawn from the procedure of their tribunals, often arbitrary and oppressive, and sometimes accompanied with extreme cruelty and torture. Letter of Mr. Cushing to Mr. Calhoun of September 29, 1844, accompanying President's message communicating abstract of treaty with China, Senate Doc. 58, 28th Cong. 2d Sess.; Letter on Judicial Exterritorial Rights by Secretary Frelinghuysen to Chairman of Senate Committee on Foreign Relations of April 29, 1882, Senate Doc. 89, 47th Cong. 1st Sess.; Phillimore on Int. Law, vol. 2, part 7; Halleck on Int. Law, c. 41.

We turn now to the treaties between Japan and the United States.

The treaty of June 17, 1857, executed by the consul general of the United States and the governors of Simoda, is the one which first conceded to the American consul in Japan authority to try Americans committing offences in that country. Article IV of that treaty is as follows:

"Art. IV. Americans committing offences in Japan shall be tried by the American consul general or consul, and shall be punished according to American laws. Japanese committing offences against Americans shall be tried by the Japanese authorities and punished according to Japanese laws." 11 Stat. 723.

The treaty with Japan of July 29, 1858, in some particulars changes the phraseology of the concession of judicial authority

to the American consul in Japan, but, as we shall see subsequently, without revocation of the concession itself. Its sixth article is as follows:

"ART. VI. Americans committing offences against Japanese shall be tried in American consular courts and when guilty shall be punished according to American law. Japanese committing offences against Americans shall be tried by the Japanese authorities and punished according to Japanese law. The consular courts shall be open to Japanese creditors, to enable them to recover their just claims against American citizens and the Japanese courts shall in like manner be open to American citizens for the recovery of their just claims against Japanese." 12 Stat. 1056.

As will be seen, the language of the fourth article of the treaty of 1857 is that "Americans committing offences in Japan shall be tried," etc.; while the language of the sixth article of the treaty of 1858 is that "Americans committing offences against Japanese shall be tried," etc. Offences committed in Japan and offences committed against Japanese are not necessarily identical in meaning. The latter standing by itself would require a more restricted construction. But the twelfth article of that treaty obviates that. It is as follows:

"ART. XII. Such of the provisions of the treaty made by Commodore Perry and signed at Kanagawa on the 31st of March, 1854, as conflict with the provisions of this treaty are hereby revoked; and as all the provisions of a convention executed by the consul general of the United States and the governors of Simoda, on the 17th of June, 1857, are incorporated in this treaty, that convention is also revoked."

It will thus be perceived that the revocation of the treaty of 1857 was made upon the assumption and declaration that all its provisions were incorporated into the treaty of 1858. The revocation must, therefore, be held to be limited to those provisions and those only which are thus incorporated, that treaty still remaining in force as to the unincorporated provisions. This has been the practical construction given to the alleged revocation by the authorities of both countries — a

construction which, in view of the     meous statement as to the incorporation into the new treaf of all the provisions of the former one, is reasonable and ju t.

Our government has always treated Article IV of the treaty of 1857 as continuing in force, and it is published as such in the United States Consular Regulations, issued in 1888. Appendix No. 1, p. 313. Its official interpretation is found in Article 71 of those regulations, which declares that "consuls have exclusive jurisdiction over crimes and offences committed by citizens of the United States in Japan." Mr. Bingham, our minister to that country for several years after the treaty of 1858, always assumed the incorporation into that treaty of all the provisions of the treaty of 1857, or that they were saved by it. When the prisoner reached San Francisco, on his way from Japan to Albany, he applied to the Circuit Court of the United States for a writ of *habeas corpus*, and cited the sixth article of the treaty of 1858, insisting that it only provided for the trial of Americans by American consular courts in Japan for offences committed against Japanese, and therefore he could not be held to answer for the murder of the second officer of the American ship Bullion, when in Japanese waters, because he was not a Japanese subject. In a communication made under date of June 8, 1881, by the minister to the Secretary of State, reference is made to this position, and the following language is used: "Nothing, in my opinion, could more strongly testify to the utter weakness of the claim made for Ross against the government than this attempt to limit the jurisdiction of our consuls in Japan over Americans, guilty of crimes by them committed within this empire, to such crimes only as they should commit upon the persons of Japanese subjects. According to this logic, Americans may in Japan murder each other and the citizens or subjects of all lands save the subjects of Japan with impunity — as it is admitted by this government that it cannot try an American for any offence whatever — and it must also be conceded that the tribunals of no other government than our own can try Americans for crimes by them committed within this empire. In giving my reasons to the department for sustain-

ing the jurisdiction of the United States in this case, and for approving as I did the conviction of Ross, in which the consul general and the four associates who sat with him had concurred, I cited Article IV of our convention of 1857 with Japan, to wit: 'That Americans committing offences in Japan shall be tried by the American consul general or consul, and shall be punished according to American law.' This provision of the convention of 1857 and all other provisions thereof were saved and incorporated in our treaty of 1858 with Japan, Article XII, [quoted above.] You will observe that Mr. Townsend Harris was the consul general of the United States who negotiated both of these treaties with Japan, and that the treaty of 1858 was ratified April 12, 1860, and that thereafter, to wit, June 22, 1860, Congress passed the act to carry into effect this treaty with Japan, and provided that the minister and consuls of the United States in Japan be 'fully empowered to arraign and try in the manner (in said statute provided) all citizens of the United States charged with offences against law committed' (by them in Japan;) [sec. 4084, Rev. Stat.]; and also by section 4086 provided that the jurisdiction in both civil and criminal matters in Japan shall '*in all cases* be exercised and enforced in conformity with the laws of the United States, which so far as necessary to execute such treaty are extended over all citizens of the United States therein, and over *all others* to the extent the terms of the treaty justify or require.' Here was the construction above stated by me asserted by the same Senate which ratified the treaty, and by the same President who approved both the treaty and the act of Congress. The President and the department have always construed the treaty of 1858 as carrying with it and incorporating therein the fourth article and all other provisions of the convention of 1857."

The legislation of Congress to carry into effect the treaty with Japan is found in the Revised Statutes, in sections most of which apply equally to treaties with China, Siam, Egypt and Madagascar (secs. 4083–4091). Confining ourselves to the treaty with Japan only, we find that the legislation secures a regular and fair trial to Americans committing offences within that empire.

It enacts that the minister and consuls of the United States, appointed to reside there, shall, in addition to other powers and duties imposed upon them respectively, be invested with the judicial authority therein described, which shall appertain to their respective offices and be a part of the duties belonging thereto, so far as the same is allowed by treaty; and empowers them to arraign and try, in the manner therein provided, all citizens of the United States charged with offences against law committed in that country, and to sentence such offenders as therein provided, and to issue all suitable and necessary process to carry their authority into execution. It declares that their jurisdiction in both criminal and civil matters shall in all cases be exercised and enforced in conformity with the laws of the United States, which, so far as necessary to execute the treaty and suitable to carry it into effect, are extended over all citizens of the United States in Japan, and over all others there to the extent that the terms of the treaty justify or require. It also provides that where such laws are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies, the common law and the law of equity and admiralty shall be extended in like manner over such citizens and others; and that if neither the common law, nor the law of equity, or admiralty, nor the statutes of the United States, furnish appropriate and sufficient remedies, the minister shall, by decrees and regulations, which shall have the force of law, supply such defects and deficiencies. Each of the consuls is authorized, upon facts within his own knowledge, or which he has good reason to believe true, or upon complaint made or information filed in writing and authenticated in such way as shall be prescribed by the minister, to issue his warrant for the arrest of any citizen of the United States charged with committing in the country an offence against law; and to arraign and try any such offender; and to sentence him to punishment in the manner therein prescribed.

The legislation also declares that insurrection or rebellion against the government, with intent to subvert the same, and murder, shall be punishable with death, but that no person

shall be convicted thereof unless the consul and his associates in the trial all concur in the opinion, and the minister approves of the conviction. It also provides that whenever in any case the consul is of opinion that, by reason of the legal questions which may arise therein, assistance will be useful to him, or that a severer punishment than previously specified in certain cases will be required, he shall summon to sit with him on the trial one or more citizens of the United States, not exceeding four, and in capital cases not less than four, who shall be taken by lot from a list which has been previously submitted to and approved by the minister, and shall be persons of good repute and competent for the duty.

The jurisdiction of the consular tribunal, as is thus seen, is to be exercised and enforced in accordance with the laws of the United States; and of course in pursuance of them the accused will have an opportunity of examining the complaint against him, or will be presented with a copy stating the offence he has committed, will be entitled to be confronted with the witnesses against him and to cross-examine them, and to have the benefit of counsel; and, indeed, will have the benefit of all the provisions necessary to secure a fair trial before the consul and his associates. The only complaint of this legislation made by counsel is that, in directing the trial to be had before the consul and associates summoned to sit with him, it does not require a previous presentment or indictment by a grand jury, and does not give to the accused a petit jury. The want of such clauses, as affecting the validity of the legislation, we have already considered. It is not pretended that the prisoner did not have, in other respects, a fair trial in the consular court.

It is further objected to the proceedings in the consular court that the offence with which the petitioner was charged, having been committed on board of a vessel of the United States in Japanese waters, was not triable before the consular court; and that the petitioner, being a subject of Great Britain, was not within the jurisdiction of that court. These objections we will now proceed to consider.

The argument presented in support of the first of these

positions is briefly this. Congress has provided for the punishment of murder committed upon the high seas, or any arm or bay of the sea within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular State; and has provided that the trial of all offences committed upon the high seas, out of the jurisdiction of any particular State, shall be in the district where the offender is found or into which he is first brought. The term "high seas" includes waters on the sea coast without the boundaries of low-water mark; and the waters of the port of Yokohama constitute, within the meaning of the statute, high seas. Therefore it is contended that, although the ship Bullion was at the time lying in those waters, the offence for which the appellant was tried and convicted was committed on the high seas and within the jurisdiction of the domestic tribunals of the United States, and is not punishable elsewhere. In support of this position it is assumed that the jurisdiction of the consular court is limited to offences committed on land, within the territory of Japan, to the exclusion of offences committed on waters within that territory.

There is, as it seems to us, an obvious answer to this argument. The jurisdiction to try offences committed on the high seas in the district where the offender may be found, or into which he may be first brought, is not exclusive of the jurisdiction of the consular tribunal to try a similar offence when committed in a port of a foreign country in which that tribunal is established, and the offender is not taken to the United States. There is no law of Congress compelling the master of a vessel to carry or transport him to any home port when he can be turned over to a consular court having jurisdiction of similar offences committed in the foreign country. 7 Opinions Attys. Gen. 722. The provisions conferring jurisdiction in capital cases upon the consuls in Japan, when the offence is committed in that country, are embodied in the Revised Statutes, with the provisions as to the jurisdiction of domestic tribunals over such offences committed on the high seas; and those statutes were reënacted together, and, as reënacted, went into operation at the same time. To both effect must

be given in proper cases, where they are applicable. We do not adopt the limitation stated by counsel to the jurisdiction of the consular tribunal, that it extends only to offences committed on land. Neither the treaty nor the Revised Statutes to carry them into effect contain any such limitation. The latter speak of offences committed in the country of Japan — meaning within the territorial jurisdiction of that country — which includes its ports and navigable waters as well as its lands.

The position that the petitioner, being a subject of Great Britain, was not within the jurisdiction of the consular court, is more plausible, but admits, we think, of a sufficient answer. The national character of the petitioner, for all the purposes of the consular jurisdiction, was determinable by his enlistment as one of the crew of the American ship Bullion. By such enlistment he becomes an American seaman — one of an American crew on board of an American vessel — and as such entitled to the protection and benefits of all the laws passed by Congress on behalf of American seamen, and subject to all their obligations and liabilities. Although his relations to the British government are not so changed that, after the expiration of his enlistment on board of the American ship, that government may not enforce his obligation of allegiance, and he on the other hand may not be entitled to invoke its protection as a British subject, that relation was changed during his service of seaman on board of the American ship under his enlistment. He could then insist upon treatment as an American seaman, and invoke for his protection all the power of the United States which could be called into exercise for the protection of seamen who were native born. He owes for that time to the country to which the ship on which he is serving belongs, a temporary allegiance, and must be held to all its responsibilities. The question has been treated more as a political one for diplomatic adjustment, than as a legal one to be determined by the judicial tribunals, and has been the subject of correspondence between our government and that of Great Britain.

The position taken by our government is expressed in a

communication from the Secretary of State, to the British government, under date of June 16, 1881. It was the assertion of a principle which the Secretary insisted "is in entire conformity with the principles of English law as applied to a mercantile service almost identical with our own in its organization and regulation. That principle is that, when a foreigner enters the mercantile marine of any nation and becomes one of the crew of a vessel having undoubtedly a national character, he assumes a temporary allegiance to the flag under which he serves, and in return for the protection afforded him becomes subject to the laws by which that nation in the exercise of an unquestioned authority governs its vessels and seamen. If, therefore," he continued, "the government of the United States has by treaty stipulation with Japan acquired the privilege of administering its own laws upon its own vessels and in relation to its own seamen in Japanese territory, then every American vessel and every seaman of its crew are subject to the jurisdiction which by such treaty has been transferred to the government of the United States."

"If Ross had been a passenger on board of the Bullion, or if, residing in Yokohama, he had come on board temporarily and had then committed the murder, the question of jurisdiction would have been very different. But, as it was, he was part of the crew, a duly enrolled seaman under American laws, enjoying the protection of this government to such an extent that he could have been protected from arrest by the British authorities; and his subjection to the laws of the United States cannot be avoided just at the moment that it suits his convenience to allege foreign citizenship. The law which he violated was the law made by the United States for the government of United States vessels; the person murdered was one of his own superior officers whom he had bound himself to respect and obey, and it is difficult to see by what authority the British government can assume the duty or claim the right to vindicate that law or protect that officer."

"The mercantile service is certainly a national service, although not quite in the sense in which that term would be applied to the national navy. It is an organized service, gov-

erned by a special and complex system of law, administered by national officers, such as collectors, harbor masters, shipping masters and consuls, appointed by national authority. This system of law attaches to the vessel and crew when they leave a national port and accompanies them round the globe, regulating their lives, protecting their persons and punishing their offences. The sailor, like the soldier during his enlistment, knows no other allegiance than to the country under whose flag he serves. This law may be suspended while he is in the ports of a foreign nation, but where such foreign nation grants to the country which he serves the power to administer its own laws in such foreign territory, then the law under which he enlisted again becomes supreme."

. The Secretary concluded his communication with the following expression of the determination of our government:

" So impressed is this government with the importance and propriety of these views, that while it will receive with the most respectful consideration the expression of any different conviction which Her Britannic Majesty's government may entertain, it will yet feel bound to instruct its consular and diplomatic officers in the East, that in China and Japan the judicial authority of the consuls of the United States will be considered as extending over all persons duly shipped and enrolled upon the articles of any merchant vessel of the United States, whatever be the nationality of such person. And all offences which would be justiciable by the consular courts of the United States, where the persons so offending are native born or naturalized citizens of the United States, employed in the merchant service thereof, are equally justiciable by the same consular courts in the case of seamen of foreign nationality."

The determination thus expressed was afterwards carried out by incorporating the doctrine into the permanent regulations of the department for the guide of the consuls on this country. 72d regulation.

The views thus forcibly expressed present in our judgment the true status of the prisoner while an enlisted seaman on the American vessel, and give effect to the purpose of the treaty

and the legislation of Congress. The treaty uses the term "Americans" in speaking of those who may be brought within the jurisdiction of the consular court for offences committed in Japan. The statute designates them as "citizens of the United States," and yet extends the laws of the United States, so far as they may be necessary to execute the treaty and are suitable to carry the same into effect, not only over all citizens of the United States in Japan, but also over "*all others* to the extent that the terms of the treaty justify or require."

Reading the treaty and statute together in view of the purpose designed to be accomplished, we are satisfied that it was intended by them to bring within our laws all who are citizens, and also all who, though not strictly citizens, are by their service equally entitled to the care and protection of the government. It is a canon of interpretation to so construe a law or a treaty as to give effect to the object designed, and for that purpose all of its provisions must be examined in the light of attendant and surrounding circumstances. To some terms and expressions a literal meaning will be given, and to others a larger and more extended one. The reports of adjudged cases and approved legal treatises are full of illustrations of the application of this rule. The inquiry in all such cases is as to what was intended in the law by the legislature, and in the treaty by the contracting parties.

In *Geofroy* v. *Riggs*, 133 U. S. 258, which was before this court at the last term, it was held that the District of Columbia, as a political community, is one of "the States of the Union," within the meaning of that term as used in the consular convention of 1853 with France; such construction being necessary to give consistency to the provisions of the convention, and not defeat the consideration given by France for her concession of certain rights to citizens of the United States. And in the present case, to carry out the intention of the treaty and statute in question, they will be construed to apply to all parties who are by public law, or the law of the country, entitled to be treated for the time, from their employment and service, as citizens. There are many adjudications to the effect that such character will be ascribed to parties and they

be held liable to all its consequences, and entitled to all its benefits, on other grounds than birth or naturalization.

A statute of Henry VIII enacted that if anybody should rob or take " the goods of the king's subjects within this realm," and be found guilty, the party robbed should have restitution of the goods. Of this statute Sir Matthew Hale said that "though it speaks of the king's subjects, it extends to aliens robbed; for though they are not the king's natural born subjects, they are the king's subjects when in England, by local allegiance." 1 Hale's Pleas of the Crown, p. 542.

In *United States* v. *Holmes*, 5 Wheat. 412, which is in point in the case before us, certain parties were indicted in the Circuit Court of the United States for the District of Massachusetts and convicted of murder on the high seas. It appeared that a vessel, apparently Spanish, was captured by privateers from Buenos Ayres, and a prize crew was put on board, of whom the prisoners were a part. One of them was a citizen of the United States and the others were foreigners. The crime was committed by drowning the person, whose death was charged, by the prisoners driving or throwing him overboard. On motion for a new trial certain questions arose on which the judges were divided in opinion. One of these was, whether it made any difference as to the point of jurisdiction, whether the prisoners or any of them were citizens of the United States, or that the offence was committed, not on board of any vessel, but on the high seas. The court said that the question contained two propositions; one as to the national character of the offender and the person against whom the offence was committed; and second as to the place where it was committed. In respect to the first the court was of the opinion that it made no difference whether the offender was a citizen of the United States or not; adding, " if it (the offence) be committed on board of a foreign vessel by a citizen of the United States, or on board of a vessel of the United States by a foreigner, the offender is to be considered, *pro hâc vice*, and in respect to this subject, as belonging to the nation under whose flag he sails."

The case of *The Queen* v. *Anderson*, L. R. 1 Crown Cases

Reserved, 161, is still more in point. There one James Anderson, an American citizen, was indicted at the Central Criminal Court in England for murder on board a vessel belonging to the port of Yarmouth, in Nova Scotia; she was registered in London, and was sailing under the British flag. At the time the offence was committed the vessel was in the river Garonne, within the boundaries of the French Empire, on her way up to Bordeaux, which city is by the course of the river about ninety miles from the open sea. The vessel had proceeded about half way up the river, and was at the time of the offence about 300 yards from the nearest shore, the river at that place being about half a mile wide. The tide flows up to the place and beyond it. The prisoner was convicted, and the case was reserved for the opinion of the court. It was contended on behalf of the prisoner that the court had no jurisdiction in the case because he was an American citizen and in a foreign country at the time the offence was committed; and also that section 267 of the Merchant Shipping Act, which it was said the Crown relied upon at the trial, applied only to British seamen. Mr. Justice Blackburn in regard to this last statement observed: "The expression, British seamen, may mean one who, whatever his nationality, is serving on board a British ship," and also that it had been decided "that a ship, which bears a nation's flag, is to be treated as a part of the territory of that nation. A ship is a kind of floating island." Counsel answered that if it floated into the territory of another nation it would cease to be so, and the jurisdiction of the flag would then be excluded, and that the man might have been tried in France; to which Chief Justice Bovill replied: "Even if he might, why should not this country legislate to regulate the conduct of those on board its own vessels, or so as to have concurrent jurisdiction?" All the judges concurred in sustaining the conviction. In giving his opinion the Chief Justice said:

"There is no doubt that the place where the offence was committed was within the territory of France, and that the prisoner was, therefore, subject to the laws of France, which that nation might enforce if they thought fit; but at the same time he was also within a British merchant vessel, on board that

vessel as a part of the crew, and, as such, he must be taken to have been under the protection of the British law, and also amenable to its provisions. It is said that the prisoner was an American citizen, but he had embarked by his own consent on board a British ship, and was at the time a portion of its crew. There are many observations to be found in various writers to show that in some instances, though subject to American law as a citizen of America, and to the law of France as being found within French territory, yet that he must also be considered as being within British jurisdiction as forming a part of the crew of a British vessel, upon the principle, that the jurisdiction of a country is preserved over its vessels, though they may be in ports or rivers belonging to another nation." p. 165.

Mr. Justice Blackburn said: "Where a nation allows a vessel to sail under her flag, and the crew have the protection of that flag, common sense and justice require that they should be punishable by the law of the flag." p. 170.

The views expressed by the Department of State, quoted above, are in harmony with the doctrine uniformly asserted by our government against the claim by England of a right to take its countrymen from the deck of an American merchant vessel and press them into its naval service. It is a part of our history that the assertion of this claim, and its enforcement in many instances, caused a degree of irritation among our people which no conduct of any other country has ever produced. Its enforcement was deemed a great indignity upon this country and a violation of our right of sovereignty, our vessels being considered as parts of our territory. It led to the War of 1812, and although that war closed without obtaining a relinquishment of the claim, its further assertion was not attempted. At last, in a communication by Mr. Webster, then Secretary of State, to Lord Ashburton, the special British minister to this country, on the 8th of August, 1842, the claim was repudiated, and the announcement made that it would no longer be allowed by our government and must be abandoned. The conclusion of Mr. Webster's communication bears upon the question before us. After referring to the claim of Great

Britain, and demonstrating the injustice of the position and its violation of national rights, he said : " In the early disputes between the two governments, on this so long-contested topic, the distinguished person to whose hands were first intrusted the seals of this department declared, that ' the simplest rule will be, that the vessel being American shall be evidence that the seamen on board are such.' Fifty years' experience, the utter failure of many negotiations, and a careful reconsideration now had of the whole subject at a moment when the passions are laid, and no present interest or emergency exists to bias the judgment, have convinced this government that this is not only the simplest and best, but the only rule which can be adopted and observed consistently with the rights and honor of the United States, and the security of their citizens. That rule announces, therefore, what will hereafter be the principle maintained by their government. In every regularly documented American merchant vessel, the crew who navigate it will find their protection in the flag which is over them." Webster's Works, Vol. VI, p. 325.

This rule, that the vessel being American is evidence that the seamen on board are such, is now an established doctrine of this country; and in support of it there is with the American people no diversity of opinion and can be no division of action.

We are satisfied that the true rule of construction in the present case was adopted by the Department of State in the correspondence with the English government, and that the action of the consular tribunal in taking jurisdiction of the prisoner Ross, though an English subject, for the offence committed, was authorized. While he was an enlisted seaman on the American vessel, which floated the American flag, he was, within the meaning of the statute and the treaty, an American, under the protection and subject to the laws of the United States equally with the seaman who was native born. As an American seaman he could have demanded a trial before the consular court as a matter of right, and must therefore be held subject to it as a matter of obligation.

We have not overlooked the objection repeatedly made and

earnestly pressed by counsel, that the consular tribunal is a court of limited jurisdiction. It is undoubtedly a court of that character, limited by the treaty and the statutes passed to carry it into effect, and its jurisdiction cannot be extended beyond their legitimate meaning. But their construction is not, therefore, to be so restricted as to practically defeat the purposes to be accomplished by the treaty, but rather so as to give it full operation, in order that it may not be a vain and nugatory act.

It is true that the occasion for consular tribunals in Japan may hereafter be less than at present, as every year that country progresses in civilization and in the assimilation of its system of judicial procedure to that of Christian countries, as well as in the improvement of its penal statutes; but the system of consular tribunals which have a general similarity in their main provisions, is of the highest importance, and their establishment in other than Christian countries, where our people may desire to go in pursuit of commerce, will often be essential for the protection of their persons and property.

We have not considered the objection to the discharge of the prisoner on the ground that he accepted the conditional pardon of the President. If his conviction and sentence were void for want of jurisdiction in the consular tribunal, it may be doubtful whether he was estopped, by his acceptance of the pardon, from assailing their validity; but into that inquiry we need not go, for the consular court having had jurisdiction to try and sentence him, there can be no question as to the binding force of the acceptance.

*Order affirmed.*