## HUSAR v. UNITED STATES.

Circuit Court of Appeals, Ninth Circuit.
June 11, 1928.

Rehearing Denied July 16, 1928.

No. 5297.

1. **Ambassadors and consuls ☞6—Jurisdiction of United States Court for China, being limited, must affirmatively appear.**

Jurisdiction of the United States Court for China, like that of other United States courts, is limited, and must affirmatively appear.

2. **Ambassadors and consuls ☞6—Jurisdictional facts held charged by information in United States Court for China for acts committed by defendant in such country while qualified district attorney for such court; "citizens" (Treaty with China 1844, art. 21; 22 USCA §§ 141, 142, 145, and § 191 et seq.).**

In view of Act June 30, 1906 (22 USCA § 191 et seq.), establishing the United States Court for China, with the jurisdiction previously exercised by United States consuls and ministers by law and by virtue of treaties between the United States and China, and providing for appointment by the President of district attorney and other officers for such court, and the Treaty with China of 1844, art. 21 (8 Stat. 596), providing that "citizens" of the United States committing crime in China shall be subject to be tried only by the consul or other public functionary of the United States, thereto authorized, according to the laws of the United States, and Rev. St. §§ 4083, 4084, 4086 (22 USCA §§ 141, 142, 145), giving the ministers and consuls in China jurisdiction for such trial, jurisdictional facts are charged by information in such court, alleging that defendant was a duly appointed district attorney for such court, and as such feloniously disposed of documentary evidence coming into his possession as such officer, all of his acts being committed in China; he being by virtue of his office a "citizen," within the law and treaty, even if not strictly a citizen.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Citizen.]

3. **Indictment and information ☞52(1)—To be valid, information need not be verified.**

Validity of any information as such is not dependent on verification; it being only where issuance of warrant of arrest is sought on the information that there must be an affidavit.

4. **Records ☞22—Judgment of conviction for destroying federal court records should not state defendant's disqualification to hold office (Cr. Code, § 129 [18 USCA § 235]).**

Judgment of conviction of offense defined by Criminal Code, § 129 (18 USCA § 235), defining offenses and declaring that one convicted thereof shall be punished by fine and imprisonment, and shall be forever afterwards disqualified from holding any office under the United States, should not, in addition to imposing punishment of fine and imprisonment, declare such disqualification.

**5. Witnesses ☞302—Under circumstances, judge's cautioning witness, who had declined to answer question as likely to incriminate him, held proper.**

The circumstances developed by colloquy, on witness, called by defendant, declining to answer a question asked, on the ground that it might incriminate him, making it proper for the court to explain to him the nature and extent of his rights, it was not improper for it, after several questions were tentatively put to him, to caution him that, if he answered, he would open the door to cross-examination on all those matters.

**6. Criminal law ☞1169(7)—Telegram between coconspirators held without evidentiary value, so that its admission was not prejudicial.**

Telegram, "Telegraph immediately 2000. Leaving immediately," from one to the other of claimed coconspirators with defendant for corrupt disposition of evidence, was without evidentiary value, so that its admission was not prejudicial.

**7. Criminal law ☞422(I)—Letter from one to other of claimed conspirators with defendant held admissible, as throwing some light on defendant's conduct and relationship with writer.**

Letter from one to other of claimed conspirators with defendant, disclosing extreme animus against defendant, and shown defendant long before the trial, in spite of which, and claimed misconduct of writer towards defendant's wife, defendant continued to act as writer's attorney up to defendant's trial, *held* admissible, together with defendant's examination in respect to it, as throwing some light on his conduct and relationship with the writer, a material issue in the case.

In Error to the United States Court for China; Milton D. Purdy, Judge.

Leonard Goodwin Husar was convicted under information charging felonious destruction and corrupt disposition of documentary evidence, and he brings error. Affirmed.

Fleming & Allman, of Shanghai, China, Alfred L. Bartlett, of Los Angeles, Cal., and Leo R. Friedman, of San Francisco, Cal., for plaintiff in error.

George Sellett, U. S. Atty. for China, of Shanghai, China (Geo. J. Hatfield, U. S. Atty., and T. J. Sheridan, Asst. U. S. Atty., both of San Francisco, Cal., of counsel), for the United States.

Before RUDKIN, DIETRICH, and HUNT, Circuit Judges.

DIETRICH, Circuit Judge. The appellant was convicted in the United States Court for China upon an information charging, in one count the felonious destruction, and in another the corrupt disposition, of a bound volume of documentary evidence which had come into his possession in the course of an official investigation he, as United States attorney, was called upon to make of the conduct of the person to whom he corruptly delivered the documents.

[1, 2] The first question is of the sufficiency of the record to disclose jurisdiction in the trial court, which, like that of other United States courts, is limited, and must affirmatively appear. For a definition thereof we must look to treaty provisions and acts of Congress passed to give effect thereto. By the Act of June 30, 1906 (34 Stat. 814, 22 USCA § 191), there was established the United States Court for China, with "exclusive jurisdiction in all cases and judicial proceedings whereof jurisdiction may have been exercised, prior to June 30, 1906, by United States consuls and ministers by law and by virtue of treaties between the United States and China," with exceptions immaterial here. Provision is made for the appointment by the President, subject to confirmation by the Senate, of a judge, clerk, district attorney, and marshal, with duties and powers similar to those of corresponding officers of the United States District Courts generally. By article 21 of the Treaty with China of 1844 (8 Stat. 592, 596), it was provided that: "Subjects of China who may be guilty of any criminal act toward citizens of the United States, shall be arrested and punished by the Chinese authorities according to the laws of China; and citizens of the United States, who may commit any crime in China, shall be subject to be tried and punished only by the consul, or other public functionary of the United States, thereto authorized, according to the laws of the United States." A similar provision was incorporated in the treaty of 1858 (article 11, 12 Stat. 1023, 1025).

At an early period legislation was passed to give effect to these treaties and others of like character with other oriental countries. By R. S. U. S. § 4083 (22 USCA § 141), it was provided that resident ministers and consuls in China and such other countries shall, in addition to other powers and duties imposed upon them by the provisions of such treaties, "be invested with the judicial authority herein described," in so far as the same is allowed by treaty. Section 4084 (22 USCA § 142) provides that such officers "are fully empowered to arraign and try, in the manner herein provided, all citizens of the United States charged with offenses against law, committed in such countries," including China; and section 4086 (22 USCA § 145), that jurisdiction in both criminal and civil matters shall in all cases be exercised

in "conformity with the laws of the United States," which in so far as they are necessary or appropriate in carrying out the treaty are "extended over all citizens of the United States" in China, "and over all others to the extent that the terms of the" treaty "justify or require." Such was the jurisdiction of American consular tribunals in China, which, by the Act of June 30, 1906 (22 USCA § 191 et seq.), establishing the United States Court for China, was transferred to this court.

Defendant contends, first, that while these statutory provisions may fairly be construed as conferring jurisdiction over defendants who are citizens of the United States at the time criminal proceedings are instituted against them, the treaty controls, and that, fairly read, it authorizes jurisdiction only in a case where the defendant was a citizen at the time the offense was committed. Under either view, admittedly the requisite jurisdictional facts existed here, for defendant as a witness in his own behalf freely testified that he was born in the United States, and has always been a citizen thereof. The defect in the record, if one there be, is one of pleading only, and not of fact, and one, it is to be added, which defendant failed to discover until after the filing of the printed brief in this case; the question being raised for the first time at the oral argument.

Assuming, without deciding, that defendant's construction of the treaty and of the relevant statutes is correct, and further that under the circumstances shown the information cannot be aided by the evidence, we are of the opinion that it sufficiently discloses jurisdiction. The introductory language is: "Leonard Goodwin Husar, a citizen of the United States of America, is accused by the United States district attorney for China, by this information, of a crime against the United States of America, as follows." Thereupon follows a direct averment that at all times mentioned the defendant was an officer of the United States, namely, the duly appointed, qualified, and acting United States district attorney for China, and that as such officer he came into possession of the volume of evidence referred to, and feloniously disposed of it in the manner particularly described; all of his acts being committed in China, within the jurisdiction of the court, and while he was such officer.

True, there is no express requirement that the United States district attorney for China shall be a citizen of the United States. Nor, so far as we have been able to discover, is there such express requirement re-

specting any other officer of the United States, excepting only the President and members of Congress (Const. U. S. art. 2, § 1, subd. 5; article 1, § 3, subd. 3, and section 2, subd. 2); and these constitutional provisions were for the apparent purpose, not of insuring against alien office holding, but of requiring American birth in the one case and prescribed periods of citizenship in the other two. The silence of the law is to be attributed to an understanding that under a republican form of government only citizens may be invested with the power and charged with the responsibility of administering its affairs, so common and fundamental that express inhibition of alien office holding is thought to be unnecessary. It is the common law of political rights.

As was said by Chief Justice Dixon, speaking for the Supreme Court of Wisconsin, in State v. Smith, 14 Wis. 539, 542: "As to all such [independent popular] governments it is an acknowledged principle, which lies at the very foundation, and the enforcement of which needs neither the aid of statutory nor constitutional enactments or restrictions, that the government is instituted by the citizens for their liberty and protection, and that it is to be administered and its powers and functions exercised only by them and through their agency." See, also, State v. Trumpf, 50 Wis. 103, 5 N. W. 876, 6 N. W. 512; State ex rel. Perine v. Van Beek, 87 Iowa, 569, 54 N. W. 525, 19 L. R. A. 622, 43 Am. St. Rep. 397; Walther v. Rabolt, 30 Cal. 185; Mechem on Public Officers, § 74; Throop on Public Officers, § 72.

It is true that, even under this view, the averment of official position does not constitute a direct and positive allegation of citizenship. But we do not need to inquire how far a defendant may go in challenging, for the first time after verdict and judgment, an information upon the ground that it charges only indirectly and imperfectly the venue or other jurisdictional fact, the existence of which is conceded, and where the imperfection cannot possibly result in jeopardy or prejudice.

Under the direct allegations of the information here, defendant committed the offense charged while he was in the exercise of the duties of an important office of the United States, and in principle, we think, the case is ruled by In re Ross, 140 U. S. 453, 11 S. Ct. 897, 35 L. Ed. 581. Ross was convicted in an American consular tribunal in Japan of murder committed in the harbor of Yokohama on board an American ship upon which he was a seaman. That tribunal's jurisdiction

was defined by a treaty and by laws substantially identical with those we are here considering. The conviction was upon a complaint charging "that John Martin Ross, an American seaman, duly and lawfully enrolled and shipped and doing service as such seaman on board the American ship Bullion, did," etc. There was no more direct or other averment bearing upon his citizenship, and, in truth, except only in so far as his status was affected by the fact that he was a seaman on an American vessel, he was a subject of Great Britain. The jurisdiction of the consular tribunal was sustained. Said the court: "The position that the petitioner, being a subject of Great Britain, was not within the jurisdiction of the consular court, is more plausible, but admits, we think, of a sufficient answer. The national character of the petitioner, for all the purposes of the consular jurisdiction, was determinable by his enlistment as one of the crew of the American ship Bullion. * * * As such [he was] entitled to the protection and benefits of all the laws passed by Congress on behalf of American seamen, and subject to all their obligations and liabilities."

And again: "The treaty uses the term 'Americans' in speaking of those who may be brought within the jurisdiction of the consular court for offenses committed in Japan. The statute designates them as 'citizens of the United States,' and yet extends the laws of the United States, so far as they may be necessary to execute the treaty and are suitable to carry the same into effect, not only over all citizens of the United States in Japan, but also over 'all others to the extent that the terms of the treaty justify or require.' Reading the treaty and statute together in view of the purpose designed to be accomplished, we are satisfied that it was intended by them to bring within our laws all who are citizens, and also all who, though not strictly citizens, are by their service equally entitled to the care and protection of the government. It is a canon of interpretation, to so construe a law or a treaty as to give effect to the object designed, and for that purpose all of its provisions must be examined in the light of attendant and surrounding circumstances."

Unless we are to hold that the allegiance due from a United States attorney, who qualifies by taking the official oath, is inferior to that of a seaman on an American vessel, it must be conceded that the jurisdictional facts are more directly and perfectly charged in this information than in the complaint in that case. And, as already suggested, if

we go back of the pleading to the actual facts, the defendant there was admittedly a subject of Great Britain, whereas here the defendant has at all times been a citizen of the United States.

[3] As to the assignment that the court erred in overruling defendant's motion to quash the information and the warrant of arrest, upon the ground that the affidavit of the district attorney supporting the information was insufficient in law, and that the clerk was without authority to issue the warrant, it will suffice to say that there is no basis in the record upon which to rest the contention. The validity of an information as such is not dependent upon verification (Wagner v. United States [C. C. A.] 3 F.[2d] 864; Albrecht v. United States, 273 U. S. 1, 47 S. Ct. 250, 71 L. Ed. 505), and it does not appear that a warrant of arrest was ever issued.

[4] The first count is predicated upon section 5408, R. S. U. S., as amended by the Act of March 4, 1909 (Criminal Code, § 129, 35 Stat. 11, 12; 18 USCA § 235), defining certain offenses, and providing that one convicted thereof shall be punished by fine and imprisonment, "and shall, moreover, forfeit his office and be forever afterward disqualified from holding any office under the government of the United States." Accordingly, the judgment below was that defendant pay a fine and be imprisoned "and be forever hereafter disqualified from holding office under the government of the United States." The contention of defendant is that this was error, for the reason that under section 4101, R. S. U. S. (22 USCA § 155), consular tribunals, and hence the United States Court for China, may impose punishment only by fine and imprisonment.

We deem it unnecessary to decide that question, for, as was said in Burton v. United States, 202 U. S. 344, 369, 26 S. Ct. 688, 694 (50 L. Ed. 1057, 6 Ann. Cas. 392), where the judgment contained a similar declaration: "The above words, in the concluding part of the judgment of conviction, do nothing more than declare or recite what, in the opinion of the trial court, is the legal effect attending or following a conviction under the statute. They might well have been omitted from the judgment." In that view, and to avoid possible embarrassment, we direct that the clause above quoted from the judgment be stricken therefrom, without prejudice, however, to the question of the effect of the judgment of conviction upon defendant's eligibility henceforth to hold public office.

[5] It is next assigned that the trial judge

is chargeable with prejudicial misconduct in connection with the interrogation upon direct examination of one Heath, called as a witness upon behalf of defendant. It seems that at the time criminal charges were pending against Heath touching the destruction of the documents referred to in the information herein. He came into court, not voluntarily, but under process of subpœna, and apparently pursuant to an understanding with defendant that he was to be asked questions only which would not incriminate him. Upon being asked when he first met one Woodward, he stated that he declined to answer, upon the ground that it might incriminate him. Thereupon followed a prolonged colloquy, participated in by the court, counsel for the defendant, the witness, and his counsel, all bearing upon the question of the extent of his privilege. The circumstances developed to be such that it was clearly proper for, if, indeed, it was not the duty of, the court to explain to the witness the nature and extent of his rights. Several questions were tentatively put to the witness, and finally the court said to him: "I will instruct you, if you answer that question, you are going to open the door to being cross-examined on all those other questions. If you take the witness stand, you take the witness stand for all purposes, to be examined in regard to matters to which you testify." Under all the circumstances, which we do not deem it necessary to detail, we find no impropriety in the caution given the witness, nor in any other feature of the incident.

[6] The evidence for the government tended to establish a conspiracy between the defendant, Heath, and one Woodward, for the improper disposition of the volume of documents. If such conspiracy there was, it was fully consummated, as defendant contends, by the end of December, 1925, and he therefore complains of the reception in evidence of a cablegram and a letter from Heath to Woodward, the former being dated November 19, 1926, and the latter January 8, 1927. The cablegram reads simply: "Telegraph immediately 2000. Leaving immediately." And it may be disposed of with the comment that it was without evidentiary value and could not possibly have been prejudicial.

[7] It is true, as defendant argues, that generally admissions made by one conspirator are admissible against another, only in case they were made in furtherance of the enterprise and while it was on foot; but the letter was not received under the conspiracy rule. According to defendant's testimony, Heath had

been guilty of conduct such as justified him, the defendant, in "beating him up," and, indeed, would have justified him in taking his life, so he contends. The letter in question discloses extreme animus on the part of Heath against defendant, and it had been shown to him long before the trial. However, in the face of Heath's alleged misconduct toward defendant's wife, and the provocative character of the letter of which he had been advised, he continued to act as Heath's attorney from the time he was returned to China for trial on the charge of conspiracy in getting away with the documentary evidence, up to the trial in the instant case. On cross-examination he was interrogated respecting the reasons for such an extraordinary change of front toward Heath, and, being shown the letter, was questioned about particular statements therein, without objection on his part, and for the first time, when the letter was formally offered in evidence, he interposed objection. Even assuming seasonable objection, the letter, taken together with his examination in respect thereto, was under the circumstances receivable as throwing some light upon his conduct and his relationship with Heath, which was a material issue.

Judgment affirmed.