(89 Misc. Rep 622)

NEWMAN v. BASCH.

(City Court of New York, Trial Term.  March, 1915.)

1. JUDGMENT ☞829—CONSULAR COURTS—EFFECT IN STATE COURTS.

Rev. St. U. S. §§ 4083–4130 (U. S. Comp. St. 1913, §§ 7633–7676), which provide for consular courts in China, and which were enacted to effectuate the provisions of the treaty with that country (8 Stat. 597), are controlling upon the state courts under Const. U. S. art. 6, § 2, making all treaties the supreme law of the land and binding upon the judges of the states, notwithstanding anything to the contrary in the provisions of the Constitution or laws of the states and the judgments of those courts are entitled to the same effect within the state as the judgments of any oher federal courts outside the state of their location.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1510–1515; Dec. Dig. ☞829.]

2. JUDGMENT ☞829—CONSULAR COURTS—EFFECT IN STATE COURTS.

Under Rev. St. U. S. § 916 (U. S. Comp. St. 1913, § 1540), providing that any party who recovers a judgment in a United States court is entitled to the same remedies to secure the enforcement thereof as are now provided in like causes by the law of the state in which the court is held, a judgment of the Consular Court of China may be sued upon in courts of New York.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1510–1515; Dec. Dig. ☞829.]

3. JUDGMENT ☞829—CONSULAR COURTS—EFFECT IN STATE COURTS.

A judgment of the Consular Court of China is entitled, under the United States Constitution, to full faith and credit in the courts of every state.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1510–1515; Dec. Dig. ☞829.]

4. JUDGMENT ☞910—ACTION ON FOREIGN JUDGMENT—LIMITATION—"COURT OF RECORD."

The United States Consular Court of China, which has general civil and criminal jurisdiction, and whose pleadings and determinations are enrolled, is a court of record, though not expressly declared so by statute, since a "court of record" is one whose acts are enrolled, so that by bare inspection the record establishes itself, and an action on the judgments of that court is barred in 20 years, under Code Civ. Proc. § 376, and not in 6 years, under Code Civ. Proc. § 382, subd. 7.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1732–1737; Dec. Dig. ☞910.

For other definitions, see Words and Phrases, First and Second Series, Court of Record.]

5. AMBASSADORS AND CONSULS ☞6—CONSULAR COURTS—REFEREES.

Under the statute requiring the consuls to encourage litigants before them to submit their controversies to referees, a judgment of the Consular Court of China, entered upon the report of a single referee, is valid, since the use of the plural in the statute does not deprive the consul of jurisdiction where there is only one referee.

[Ed. Note.—For other cases, see Ambassadors and Consuls, Cent. Dig. §§ 16–20; Dec. Dig. ☞6.]

Action by Martha K. Newman against Louis Basch.  Judgment directed for plaintiff.

Henry S. Dottenheim, of New York City, for plaintiff.
Henry Brill, of New York City, for defendant.

McAVOY, J. An issue of novel impression is raised by the pleadings in this action. The declaration is upon an alleged judgment of the United States Consulate General of Shanghai, China. The plea is that the judgment was not duly given or rendered.

Consuls have anciently been the repositories of quasi judicial functions. As representatives of the variform populations of the mediæval Italian city republics it was by custom and usage the rule to refer to them the settlement of differences in commercial matters between citizens of their national sovereignty, and ultimately criminal causes involving persons of the same nationality committed within the quarter of the city where their nationals were accustomed to resort were tried and punished under and according to foreign or exterritorial authority. In 1199 A. D. the Emperor Alexius III issued a chrysobulum of privileges conceded to the Venetians in Greece of exterritorial character which granted to the Venetians right of trial of criminal and civil causes before their local representatives at Constantinople. In 1304 A. D. Emperor Andronicus II granted a privilegium aurea bulla nostra munitum declaring the rights and jurisdiction of the republic of Genoa within his realm. The Genoese were to be subject only to the jurisdiction of their national authorities in the Byzantine capital. No injury was to remain unpunished, no right unenforced, whether of or against Greek or Genoese, in these Genoese consular courts. See Monumenta Patriæ Historiæ, Liber Jurium Reipublicæ Genuensis, vol. 2, p. 440. The consuls of the city of Marseilles were granted jurisdiction over their fellow citizens at Tyre and Acre. The Venetian consul at Tyre bound himself by oath "to render justice according to the customs of the port," and if these were not of a determinative character, then upon principles of natural justice. See Merchants' Rights under the Crusaders, Hinckley, p. 4. From 1154 A. D. to 1445 A. D. the Italian city republics of Pisa, Genoa, Venice, and Florence secured capitula or treaties governing their subjects' rights and privileges in many of the sovereign cities among the Mediterranean, in Egypt, and abutting the Barbary Coasts. Subsequent to the diminution of influence of the Italian republics is observed the rise of influence of France in affairs in the Levant, which is continuous to our own day. And it is said by celebrated writers on diplomatic and consular subjects that the capitulations of modern treaties differ little from those obtained by Francis I from the Sultan Suleiman in 1535 A. D. This was the first of the capitulations obtained by a great European power from the Ottoman Porte. Hinckley's American Consular Jurisdiction, p. 10.

[1] The United States early began the attempt to secure these exterritorial rights for its citizens resident abroad, and concluded its first treaty of this character in 1787 with Morocco, but the earliest act of our Congress relating to American consular jurisdiction in the Orient is an act of August 11, 1848 (9 Statutes at Large, p. 276, c. 150). In its report proposing the adoption of the bill the Senate judiciary committee stated that it was necessary to the execution of the treaty or capitulation with China of 1844 (8 Stat. 597). This treaty provided (article 25):

"All questions in regard to rights, whether of property or person, arising between citizens of the United States in China, shall be subject to the jurisdiction and regulated by the authorities of their own government; and all controversies occurring in China between citizens of the United States and the subjects of any other government shall be regulated by the treaties existing between the United States and such governments, respectively, without interference on the part of China."

Following this the act of June 22, 1860 (12 Statutes at Large, 72, c. 179), was passed in order to effectuate and carry out the capitulations in the new treaties with China, Japan, and Siam. The second treaty with China was ratified June 18, 1858 (12 Stat. 1023), and again bound the contracting nations by article 27, which is in the very words heretofore quoted from the treaty of 1844, the former and the latter treaties and the act of July 1, 1870 (16 Statutes at Large, 183, c. 194), comprising the basic law governing the erection and constitution of Consular Courts of China, as embodied in the Revised Statutes of the United States (sections 4083 to 4130 [U. S. Comp. St. 1913, §§ 7633–7676]). Since these acts of Congress all declare their intent to effect the provision of treaties granting extraterritorial jurisdiction, they are as such extensions of the treaty provisions in their relation and control over the judicial branch of the government, whether state or federal, under article 6, § 2, of the Constitution of the United States, providing that:

"All treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

The judicial authority of the United States consuls created to carry into full effect the provisions of treaties is as equally binding on state courts as are any of the capitulations of a treaty. The authority is conferred by the Revised Statutes, § 4083, as follows:

"To carry into full effect the provisions of the treaties of the United States with China, * * * the minister and the consuls of the United States, duly appointed to reside in each of those countries, shall, in addition to other powers and duties imposed upon them, respectively, by the provisions of such treaties, respectively, be invested with the judicial authority herein described, which shall appertain to the office of minister and consul, and be a part of the duties belonging thereto, wherein, and so far as, the same is allowed by treaty." Act June 22, 1860, 12 Statutes at Large, 72; Act July 28, 1866, c. 296, 14 Statutes at Large, 322.

The jurisdiction in civil causes conferred is to embrace all controversies between citizens of the United States or others provided for by such treaties; and jurisdiction in civil matters in all cases is to be exercised and enforced in conformity with the laws of the United States, which are, so far as is necessary to execute such treaties, extended over all citizens of the United States in those countries. Since the statutes of the United States are extended over and apply to the enforcements of the capitulations of the treaties conferring jurisdiction, as well as grant the imposition of judicial authority, the judgments or determinations called judgments are subject to and have the same force and effect and are entitled to the same enforcing remedies within any state as judgments of federal courts outside of the state

bf their territorial location. The effect of judgments of the United States courts and their process is the same as the effect of judgments of a state court. United States v. Morrison, 4 Pet. 124, 7 L. Ed. 804; Barth v. MaKeever, 4 Biss. 206, Fed. Cas. No. 1,069.

[2] By section 916 of the Revised Statutes of the United States (U. S. Comp. St. 1913, § 1540), any party who recovers a judgment in any common-law cause and in a United States court is entitled to similar remedies upon the same to reach the property of the judgment debtor as are now provided in like causes by the law of the state in which the court is held. The remedy of suit upon a judgment to awaken an expiring or expired judgment lien is thus by statute, if not by the comity relation, a remedy applicable to and enforceable through a judgment under the judicial authority of the United States. It seems clear, then, in exploring this unbeaten path without aids from precedents, that analogous reasoning justifies the conclusion that this consular judgment is properly sued upon as such.

[3] The determination or judgment of the Consular Court having been made with jurisdiction of the parties and the subject-matter, it seems to me that it is entitled equally with judgments throughout the United States to full faith and credit in the courts of every state in the Union, in like case with judgments of state courts under our federal Constitution.

[4] Is this court, then, having criminal jurisdiction, whereby the consul was fully empowered to arraign and try all citizens of the United States charged with offenses against the law committed by them in China, and in civil causes embracing all controversies between citizens, a court of record? The determination of this question is necessary, because if the consular judgment is one of a court not of record, then the limitation of 6 years upon a suit on a judgment rendered therein would apply. Section 382, subd. 7, Code of Civil Procedure. And if the court be one of record, the time in which the judgment is presumed to be paid and satisfied is after the expiration of 20 years. Section 376, Code of Civil Procedure. It is not to be overlooked that this consular tribunal is a court of limited jurisdiction. Its limitations are contained in the treaty with the foreign nation affected and the statutes passed to carry such treaty into effect. Its jurisdiction cannot therefore be extended beyond their legitimate meaning. See Ross v. McIntyre, 140 U. S. 453, 11 Sup. Ct. 897, 35 L. Ed. 581.

However, neither treaty provides nor the statute declares a provision which erects these consular courts as courts of record; but this is not decisive against the claim that they are courts of record. The Circuit Court of the United States, erected by statute, pursuant to the authority of Congress, is not declared by any statute to be a court of record; but it has been declared to be so by judicial opinion, and is universally recognized as such so far as its judgments and other jurisdictional matters are concerned. The Thomas Fletcher (C. C.) 24 Fed. 481. The court there determined the question upon the ground that a writ of error would run to it, citing 3 Blackstone's Commentaries, 406, wherein is contained the definition that a court of record is "a court where the acts and judicial proceedings are en-

rolled in parchment for a perpetual memorial and testimony," which *rolls* are called the records of the court, and are of such high and supereminent authority that their truth is not to be called in question. If the existence of a record be denied, it shall be tried by nothing but itself; that is, upon bare inspection whether there be any such record or no, else there would be no end of disputes. See 3 Blackstone's Commentaries, 24. Rolls or records contain a history of the proceedings of the cause to which they relate; they give the name of the court in which the judgment was rendered, when and where it was held, the process, pleadings, adjournments, verdict, and judgment of the court. They are authenticated by a signature of some public officer and kept as a perpetual memorial of the transaction. When issue is joined upon the existence of such record, it is tried and decided by the record itself.

Neither is a statutory declaration that a court is a court of record conclusive on the courts, if its history, procedure and practice do not comport with the usual definition with which judicial construction has surrounded this character of tribunal. For instance in Wheaton v. Fellows, in 23 Wend. 375, a statute declaring the Justice's Court of the City of Albany, instituted in 1821, to be a court of record, was held not to constitute the court in a strict legal sense entitled to that character, because its judgments were not enrolled. They were merely entered in a book kept for that purpose, and these entries were held not to constitute what in legal language is called a record. The distinction indicated in that case between courts of record and not of record related back to the differences recognized in common-law pleas. At common law the plea to an action upon a judgment rendered in a court not of record was a plea nil debet; to the judgment of those courts whose records import absolute verity, to an action of debt on a judgment, the plea nul tiel record is the proper plea, and nil debet is bad on demurrer, though good after verdict. Bullis v. Giddens, 8 Johns. 82; White v. Converse, 20 Wend. 266.

Applying this test, if the plea of nul tiel record were to be made here, a trial by inspection of the record presented and proof of the judgment roll, without extraneous aid through other evidence, exhibits jurisdiction of the defendant and subject-matter and a determination within such jurisdiction by the proper tribunal after submission by the defendant summoned. This would suffice. It is not sufficient, according to the Court of Appeals (Hutkopf v. Demorest, 103 N. Y. 377, 8 N. E. 899, 10 N. E. 535), to constitute a court of record in a legal sense that the court should have a clerk and a seal. It should be so administered and conducted that, if the existence of the record be denied, it shall be tried by nothing but itself—that is, upon bare inspection—whether there be any such record or no.

If evidence of the court's character may be allowed from its own regulations, the following consideration is pertinent: The regulations for the Consular Court of China, which are permitted under the statute creating the same, and are made of the force of law, provide, with reference to the papers in a cause, as follows:

"Regulation 81. Consular Court Regulations for China.—All original papers shall be filed at once and never removed. No person but an officer of the

consulate or the minister should be allowed access to them. All papers in a case must be kept together in one inclosure and numbered as in the docket, with the parties' names, the nature of the proceedings, the period of filing the petition and the final judgment conspicuously marked on the inclosure, and each year's cases kept by themselves in their order."

Since it has not been judicially determined that this Consular Court is a court of record, or, as has been said, is it declared as such in the treaty allowing the creation of these extraterritorial courts, or in the statute carrying them into effect, a rule to the effect that it possesses the characteristics of such a court must be made by analogy, applying the ancient tests of the characteristics necessary to so constitute it.

A court declared to be a court of record by statute is held by the Court of Appeals to be not a court of record as a matter of judicial opinion. Wheaton v. Fellows, 23 Wend. 375. And a court not declared to be a court of record by statute is declared to be such through judicial reasoning and determination. The Thomas Fletcher, supra. The right, therefore, to be so considered, must depend on legal history rather than statutory declaration or judicial precedent. Because of the importance of its litigation, its long-continued exercise of jurisdiction in all matters of civil and criminal conception, its enrollment of pleadings and determinations, so that by bare inspection the record establishes itself, I conclude that its characteristics do establish it as a court of record within the legal sense, the time during which its judgments may be presumed to be satisfied or discharged extending to 20 years after rendition.

[5] The statutes declare it to be the duty of minister and consul to encourage the settlement of controversies of civil character by mutual agreement or by submitting them to a decision of referees agreed upon by the parties. At the court of the consul this controversy was by mutual agreement submitted to a single referee, and his report signifies that he heard and decided the case, and the consul indicates his acceptance of the decision and directs entry of the judgment. I do not agree that the use of the plural word in the statute ousts the jurisdiction of the consul in causes referred by agreement to a single referee, because submission to the jurisdiction of the Consular Court and to the decision of a referee is sufficient for the exercise of the consular duty of acceptance of the decision and the direction for judgment and the execution thereof.

There is no limitation in the statute as to the number of referees necessary to render an award. I should feel inclined to hold that the legislation was mandatory were the requirement in the statute for a specific number of referees. Since no number is mentioned and no requisite indicated as to the number who must join in an award, I conclude that it is left to the agreement of the parties as to whether or not there should be one or more referees.

I accordingly direct judgment for the plaintiff for the amount of the Consular Court's judgment, with interest.