### In re BERUE.

### Civ. No. 777.

District Court, S. D. Ohio, E. D.

Feb. 9, 1944.

William L. Standard, of New York City, and Edward Lamb, of Toledo, Ohio, for petitioner.

Sheldon E. Bernstein, Department of Justice, and Archibald King, Colonel J. A. G. D., United States Army, both of Washington, D. C., and R. J. O'Donnell, Asst. U. S. Atty., of Columbus, Ohio (Tom C. Clark, Asst. Atty. Gen., and Myron C. Cramer, Major General, United States Army, The Judge Advocate General, of Washington, D. C., on the brief), for respondent.

UNDERWOOD, District Judge.

This cause comes into this Court for consideration upon a petition for a writ of habeas corpus filed by Frances Berue, wife of Jacob M. Berue. For convenience, Jacob M. Berue, the prisoner, will be referred to herein as the petitioner.

By agreement of counsel, the evidence before the Court has been limited to certain stipulated facts and certain documentary exhibits. The case has been submitted upon this evidence and the briefs of counsel.

The facts of the case as shown by the stipulation and the exhibits may be stated as follows: Jacob M. Berue was a merchant seaman employed on a merchant vessel, the S. S. Anthony Wayne, having been hired at a union hall pursuant to a union agreement. His status being that of civilian deferred from military service by reason of his occupation as a seaman.

The Anthony Wayne was the property of the United States, being operated by the Matson Navigation Company, a private corporation, under the terms of a general agency agreement with the War Shipping Administration. Prior to the time in question, the vessel had been assigned by the War Shipping Administration to the Army by a letter of allocation, although this allocation was unknown to the petitioner.

On or about November 29, 1942, the petitioner boarded the vessel then lying at Pier 2 of the New York Port of Embarkation which is sometimes referred to as the "Army Base", located at Brooklyn, New York; from that time forward, he served as messman until the commission of the acts for which he was tried by court-martial. While the vessel was lying at Pier 2 subsequent to November 29, 1942, and while the petitioner was on board, the Anthony Wayne took on army cargo which constituted its entire cargo.

During the voyage in question, the vessel carried one officer of the United States Army, a Lieutenant designated as "Cargo Security Officer", whose duty was to prevent larceny of, or damage to the cargo.

On or about December 8, 1943, sailing orders "by command" of a Major General, and signed by a Colonel, Transportation Corps, were delivered to the Master of the Anthony Wayne. Pursuant thereto, the vessel left the pier at the army base, December 10, 1942, and proceeded to a point in New York Harbor, anchoring off Stapelton, Staten Island, New York. On December 13, 1942, she sailed with a convoy bound for Casablanca, Morocco.

The convoy of which the vessel was a part, consisted of some thirty vessels, all carrying cargo of the same type. Each, with one exception, carried a Cargo Security Officer. Every vessel in the convoy was operated under sailing orders from the Commanding General of the New York Port of Embarkation and all of them were bound for Casablanca.

On December 15, 1942, while the convoy was yet on the high seas, an incident occurred between the petitioner and certain officers and members of the crew. As a result, the Master put the petitioner in chains for a few hours and demoted him from messman to dishwasher.

The convoy arrived at Casablanca, December 30, 1942, and the petitioner was confined in the port stockade. He was charged with violating the 96th Article of War, 10 U.S.C.A. § 1568; a general court-martial was convened and he was brought to trial. His counsel objected to the jurisdiction of the Court; the objection was overruled and he was convicted and sentenced. The sentence was thereafter reduced and approved as reduced. The record was transmitted to the Judge Advocate General of the United States Army and proceedings were had thereon as shown by the record introduced in this proceeding. Pursuant to said sentence, the petitioner was confined in the Federal Reformatory, Chillicothe, Ohio. This action is brought to obtain his release therefrom.

As a matter of agreement between counsel, and perhaps as a matter of law also, there is but one issue in the case before this Court, and that is whether or not the military court convened at Casablanca had jurisdiction. If jurisdiction existed, this Court can inquire no further and must deny the writ; on the other hand, if it did not exist, the sentence imposed was void, and it would be the duty of this Court to grant the writ and discharge the petitioner.

Courts martial are courts of limited jurisdiction and if jurisdiction existed in this case, it must be founded upon the Second Article of War, subdivision (d), 10 U.S.C.A. § 1473(d), defining certain classes of persons subject to the Articles and reading as follows: "All retainers to the camp and all persons accompanying or serving with the Armies of the United States without the territorial jurisdiction of the United States, and in time of war all such retainers and persons accompanying or serving with the Armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles."

In this particular case, we are concerned with only the latter part of the Article. This Court takes judicial notice of the fact that the United States of America is now at war with the Axis Powers. It is conceded that

if the petitioner was subject to the jurisdiction of the court-martial, it was because he was a person "accompanying or serving with the Armies of the United States in the field * * * without the territorial jurisdiction of the United States, though not otherwise subject to these articles."

■ It has been vigorously argued on behalf of the petitioner that he was a merchant seaman and was in no sense a member of the armed forces of the United States. This may be conceded as an established fact, but if the phrase "though not otherwise subject to these articles", used in the Second Article, has any meaning at all, it must mean to include those who are not members of the Armies of the United States. Both the words themselves and their context so indicate. If the petitioner were a member of the Army, he would be "otherwise subject to these articles."

Admittedly, the high seas constitute an international highway and are in nowise "within * * * the territorial jurisdiction of the United States". It is not, however, necessary to discuss this point to any length for in time of war, such jurisdiction exists "both within and without the territorial jurisdiction of the United States." If it may be argued that the vessel itself be considered a floating part of the United States, this in itself would not defeat the jurisdiction if the place at which the offense was committed was "in the field."

■ The pertinent question in this proceeding is whether or not the petitioner was a person, "accompanying or serving with the Armies of the United States in the field."

By natural reasoning processes, this single question becomes two more direct questions: First, was the point upon the high seas where the offense occurred, and at that time, "in the field"; and Second, was the petitioner then and there "accompanying or serving with the Armies of the United States."

The phrase "in the field" has been aptly interpreted in the following terms: "The words 'in the field' do not refer to land only, but to any place, whether on land or water, apart from permanent cantonments or fortifications, where military operations are being conducted." Ex parte Gerlach, D.C., 247 F. 616, 617.

This interpretation is as applicable to the facts of the instant case as to those in the Gerlach case. While various meanings have been ascribed to the words used, this Court is aware of no instance where any court has held a location, either on land or water, where the armed forces of belligerent nations meet in armed conflict as a matter of common occurrence, with consequent loss of life and property, to be other than "in the field".

The present facts and circumstances speak for themselves. There was but one reason why the Anthony Wayne was a part of a large convoy and that is because it was in waters infested by submarines and other naval craft of the Axis Nations. The long lists of submarine sinkings to which the public became accustomed during the interval in question, can leave no doubt in the mind of any thinking person but that our convoys traversing the high seas were in every sense of the term, not only "in the field", but in actual combat zones. No reasonably intelligent merchant seaman could fail to realize and appreciate the fact that he and his vessel were in constant and deadly peril throughout the voyage, or that he was passing through waters frequently the scene of violent armed conflict. These facts are too well known to be disregarded or waved aside. This Court therefore has no hesitation in holding that the Anthony Wayne was, at the time of the offense in question, "in the field", within the meaning and intent of the Second Article of War. The convoy was simply a means of conveyance used by the army in bringing up supplies and munitions through territory constantly subject to enemy attack. Whether the road lay over land or water and whether short or long, could make no difference; the course traversed constituted a supply line to our armed forces abroad, menaced throughout its length by armed forces of the enemy.

■ The second question for determination is whether or not the petitioner was a person "accompanying or serving with the Armies of the United States." The answer to this question must be found in the facts and circumstances surrounding the voyage. It has been stipulated that the Anthony Wayne had been assigned by the War Shipping Administration to the army by letter of allocation, thus the vessel became at that time, to all intents and purposes, the property of the army; in more pertinent language, an army conveyance. Thereafter it was loaded exclusively with military supplies, at Pier 2, New York Port of Embarkation. Prior to departure, a General

of the United States Army gave the Master detailed secret sailing orders in writing, specifically directing that after 8 p.m. on the following day, no officer or member of the crew should have shore leave. It is therefore apparent that the army having taken control of the vessel, loaded it with its own cargo, assumed control, through the Master, of both the ship and its personnel, adapting them to its purpose of secretly transporting its supplies to the specific area where they were needed. The direction that there should be no shore leave was an apparent recognition on the part of the army, that every man on board had potential ability to endanger the success of the enterprise.

In the opinion of this Court, the facts and circumstances can lead to but one conclusion, and that is that the army was itself engaged in transporting by its own conveyance, its own supplies to the front. The conclusion is inescapable that the petitioner was "accompanying or serving with the Armies of the United States", within the intent and meaning of the Second Article of War.

In conclusion, the Court desires to consider briefly some of the more important arguments advanced on behalf of the petitioner. It has been argued with much force that the trial of the petitioner by court martial deprived him of his constitutional liberties guaranteed under the Fifth and Sixth Amendments. It is, however, no new concept of law that when one's connection with the army is of such nature that he becomes subject to jurisdiction by court martial, there is no constitutional objection to a trial by court martial, be the person concerned, soldier or civilian. It should also be pointed out that in the case In re Ross, 140 U.S. 453, 464, 11 S.Ct. 897, 900, 35 L.Ed. 581, the Supreme Court of the United States, speaking of such constitutional provisions, stated: "The deck of a private American vessel, it is true, is considered, for many purposes, constructively as territory of the United States; yet persons on board of such vessels, whether officers, sailors, or passengers, cannot invoke the protection of the provisions referred to until brought within the actual territorial boundaries of the United States." In the same case, and considering the return to the United States for trial of a person accused, the Court said: "There is no law of Congress compelling the master

of a vessel to carry or transport him to any home port, when he can be turned over to a consular court having jurisdiction of similar offenses committed in the foreign country." 140 U.S. at page 471, 11 S.Ct. at page 902, 35 L.Ed. 581.

Can it then be said that the Master of the Anthony Wayne was bound to return the petitioner to the United States where he might secure the advantages guaranteed by the Constitution?

It has likewise been urged that the petitioner did not knowingly take upon himself a status subjecting him to the jurisdiction of a court martial. It is elementary that consent cannot confer jurisdiction. This Court is of the opinion that the existence of jurisdiction cannot be defeated by lack of consent or lack of knowledge that such jurisdiction exists. Assuredly one who committed a crime without knowing that he was thereby subjected to the jurisdiction of a Federal Court, could not be heard to contest the jurisdiction upon that ground. It is proper, therefore, to determine the question of jurisdiction upon the facts and circumstances; it cannot rest upon knowledge or consent.

Counsel for the petitioner in this case has urged that denial of the writ herein would result in subjecting possibly two hundred thousand merchant seamen to military law. If that be the result, this Court cannot assume the responsibility of attempting to reform the law as it is written. It may be said, however, that since the Congress has by a single act subjected several million men of military age to military law, without their consent, and at $50 per month, it is not unconscionable to subject two hundred thousand more men engaged in the war effort at a much higher wage, to the same law. The Court does state, however, that the case now before it must be decided upon its own merits and in conformity with law. The decision cannot be determined by results which may flow from it.

It is the conclusion of this Court that the petitioner was a person "accompanying or serving with the Armies of the United States in the field", within the intent and meaning of the Second Article of War. It follows that the court martial convened at Casablanca had jurisdiction to try and to sentence the petitioner. The petition will therefore be dismissed and the writ denied.

Order accordingly.