UNITED STATES, Appellee

v.

JAMES ROBERTSON, Merchant Seaman, Civilian, Appellant

5 USCMA 806, 19 CMR 102

807

No. 5441

Decided May 27, 1955

 ██

CDR Parker E. Cherry, USN, for Appellant.
CDR George H. Rood, USN, CAPT Wesley C. Blake, USMC, and ENS Mitchell W. Rabbino, USNR, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

On May 31, 1953, the S. S. Provo Victory—a United States Department of Commerce vessel allocated to the Military Sea Transportation Service under a General Agency Agreement between the National Shipping Authority and the Foreign Steamship Company—was docked at Yokohama and engaged in the discharge of cargo intended for the United States Armed Forces in Japan. The accused, Robertson, was a merchant seaman serving as a member of the ship's crew.

On the morning of that day, Robertson and the deceased spent several hours drinking in a waterfront bar. An argument developed, and when the arena was shifted to the street, the accused was seen to strike the other several times on the head with a stick or light club. The victim died shortly thereafter as a result of a brain hemorrhage —due in part, apparently, to his unfortunate possession of an unusually thin and soft skull. A charge of premeditated murder was referred for trial to a Navy general court-martial, which convicted Robertson of unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712, and sentenced him to be confined at hard labor for twenty-five years. Although the convening authority did not disturb either the findings or sentence, a board of review in the office of The Judge Advocate General—after affirming the findings— reduced the sentence to confinement by ten years. We granted the accused's timely petition for review to determine (1) whether the exercise of jurisdiction over him by the court-martial was lawful, and (2) whether the law officer erred in refusing the defense's request for an instruction on involuntary manslaughter. Since a determination of the jurisdictional issue may conceivably obviate a treatment of the instructional question, we shall, at the outset, focus attention on the power of the court-martial to try this accused person.

II

It is apparent that our decision in United States v. Garcia, 5 USCMA 88, 17 CMR 88, constitutes the primary authority of military law for determining whether court-martial jurisdiction exists with respect to certain classes of civilians. It is equally evident, however, that the present one is not in every respect the Garcia case. For one thing, here the question of jurisdiction was raised promptly at the trial level by motion to dismiss, was carefully preserved before the board of review, and was presented to this Court in able briefs by appellate defense counsel. Conversely, Garcia first questioned before this Court the jurisdiction of the tribunal which convicted him. Seeking to evade trial in both American and Japanese forums, he blunted the force of his attack on military jurisdiction by stipulating to facts which, if true, would clearly establish its presence. On the other hand, Robertson consistently op-

·posed the control of the court-martial over him and conceded nothing. Nowhere in the defense strategy of the case at bar do we find any sort of positive act by the accused calculated even remotely to point in the direction of establishing jurisdiction on the part of the court-martial.

It seems obvious to us that Garcia had every reason to consent willingly to military jurisdiction over his person, for—as we observed there—"The accused was charged, inter alia, with robbing one Japanese National and misappropriating the motor vehicle of another. . . . If he was not to be tried by court-martial, in what forum would his trial be held? Obviously in a Japanese court." The lenient sentence imposed by the court-martial indicates the undoubted wisdom of his election to stand trial before a military tribunal, rather than to face a court composed of possibly less sympathetic Japanese Nationals. Therefore, we saw no injustice in denying Garcia leave to contradict his stipulation.

Robertson's position, on the other hand, is as different as night from day. He stands convicted of murdering a fellow seaman, a crime looked on with active disfavor by Naval authorities, but one which might cause less intense concern in a Japanese *milieu*. As a result, Robertson could only benefit by a favorable decision on the jurisdictional issue. Accordingly, if jurisdiction does attach in this case, it must be found in the accused's *status* when the crime was committed, and not in any style of acquiescence in his trial by court-martial.

### III

While the instant homicide occurred ashore in Yokohama, it may be profitable to inquire into the question of jurisdiction over the accused on the hypothesis that the crime took place near Japan, but on the high seas. Basic to our inquiry is the provision, found in Article 2(11) of the Uniform Code, 50 USC § 552, that "The following persons are subject to this code:"

"(11) Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States and without the following territories: That part of Alaska east of longitude one hundred and seventy-two degrees west, the Canal Zone, the main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands."

In view of this supposititious location—that is, on the high seas—no account need be taken of any sort of treaty, agreement or rule of international law, and the sole issue is one of whether Robertson was "serving with, employed by or accompanying the armed forces."

In this connection it becomes necessary to consider in greater detail the circumstances under which the accused shipped on the S. S. Provo Victory. That vessel, it will be recalled, was owned by the National Shipping Authority. This agency was established under the aegis of the Maritime Administration and ultimately, of course, that of the Department of Commerce. Its chief function is the formulation and execution of plans for the acquisition, allocation, and operation of merchant vessels. Naturally the importance of these purposes increased sharply with growth in the need for shipping space in which to transport military cargo to the Far East during the course of the late Korean hostilities.

One method on which the National Shipping Authority relied for the operation of its vessels was the General Agency Agreement, provision for which was made in National Shipping Authority Order No. 1 (AGE-1). By means of such an agreement, the Shipping Authority contracts with a private concern —here the American Foreign Steamship Company—that the latter shall "as its agent and not as an independent contractor . . . manage and conduct the business of vessels assigned to it by the United States from time to time and accepted by the General Agent." In addition to other duties, the agent agrees to procure masters for the vessels operated by it, and "the Master shall be an agent and employee of the United

States, and shall have and exercise full control, responsibility and authority with respect to the manning, navigation and management of the vessel." The general agent contracts to make available to the master for engagement by him the officers and men required to fill the complement of the vessel— these persons being "procured by the general agent through the usual channels and in accordance with the customary practices of commercial operators and upon the terms and conditions of the General Agent's collective bargaining agreements, if any."

Here the Provo Victory was allocated by the owner, the National Shipping Authority, to the Military Sea Transportation Service on a per diem basis. This allocation did not constitute a charter of the vessel in anything like the usual sense. Presumably it was not, for example, accomplished by a "written instrument executed in due form." See Webster's New Collegiate Dictionary, 1949, page 140. However, like any time charter, it left the Military Sea Transportation Service free to determine the uses to which the vessel should be put and the lanes it would traverse. In fact, the routing orders for the vessel came from the Military Sea Transportation Service—and doubtless it was in compliance with directives from such a source that the Provo Victory arrived in Yokohama on the voyage with which we are now concerned.

The accused in the Garcia case was a civil service employee of the United States serving aboard a United States Naval ship, the General Collins. Accordingly, we are sure that no slightest question concerning the existence of military jurisdiction would have been possible in light of the provisions of Article 2(11)—had his offenses been committed on the high seas prior to arrival in Yokohama and before the ultimate termination of his civil service status. Robertson, on the other hand, distinctly was not a civil service employee, but had been hired in accordance with customary practice through a union hiring hall. As a civil service seaman from a Military Sea Transportation Service vessel, Garcia, if stranded in Japan, would not, on the basis of that status, have been entitled to relief and repatriation assistance from the American Foreign Service—aid generally granted to destitute American Seamen. See 2 Foreign Service Manual, § 547.12. Robertson, however, could have sought and readily secured such assistance.

Yet there are aspects in which Robertson's status must be deemed to differ from that of the typical merchant seaman employed by a private steamship company. This was made clear by the Supreme Court in its consideration of the right of seamen on General Agency Agreement vessels to sue the private concern operating the vessel as general agent. The ships in question in the cases cited below were owned by the War Shipping Administration and operated as a part of American military efforts during World War II. However, the crew had been obtained by the general agent through the usual commercial channels. Ruling that nonetheless the seamen concerned were Government employees, the Court held that an injured crew member could not invoke the Jones Act against the steamship company for negligence, but instead would enjoy rights against the United States only. Cosmopolitan Shipping Co. v. McAllister, 337 US 783, 93 L ed 1692, 69 S Ct 1317; Weade v. Dichmann, Wright & Pugh, 337 US 801, 93 L ed 1704, 69 S Ct 1326; Fink v. Shepard Steamship Co. 337 US 810, 93 L ed 1709, 69 S Ct 1330. A comparison of the standard agreements in use then with those now employed by the National Shipping Authority suggests that a similar result would be reached as to Robertson if he were in court today in an attempt to claim damages for alleged negligent injuries received aboard the Provo Victory, and not for the purpose for which he is before us now.

While Robertson might be considered a Government employee for some purposes at least, we find it difficult to regard him as an employee of the Armed Forces, within the meaning of Article 2(11). However, the case law appears to support the conclusion that he became a person "accompanying" the armed forces when his vessel was allocated to the Navy for use in transporting military cargo. For instance,

the seaman involved in McCune v. Kilpatrick, 53 F Supp 80 (ED Va) had been hired in Norfolk through the Seafarer's International Union to serve aboard the Thomas B. Robertson. This vessel was operated—apparently pursuant to a General Agency Agreement—by the Mississippi Shipping Company under contract with the United States Government, the owner. Prior to the vessel's departure, McCune became dissatisfied with the duties to which he had been assigned, and literally jumped ashore as the Robertson was pulling away from the dock. Promptly he was tried by court-martial for desertion.[1] The Federal District Court in a habeas corpus proceeding observed that a civilian is presumed not to be a person subject to military law, but determined that jurisdiction over McCune had been sustained. The judge concluded that—for purposes of jurisdiction under Article of War 2 over persons "accompanying or serving with the Armies of the United States in the field" during time of war—the vessel was "in the field," despite its location at Norfolk, and the seaman was "accompanying" the Army.

McCune complained that he had not been aware that he was subject to military law, or was accompanying the Army in the field. To this the court replied:

". . . However, in my opinion, there is nothing in Article 2(d) of the Articles of War or in the constitutional provisions from which that Article derives its authority, requiring that a civilian to whom military law applies under that Article, must know in advance, or be given to understand, that military law is thus applicable, nor is there anything in that Article, or its constitutional source, requiring that the individual thus subjected understand that he is accompanying or serving with the army in the field, within the meaning of those terms. The test is solely an objective one, and the only inquiry is whether in fact from all the circumstances of the particular case, the person is accompanying or serving with the army in the field. Since the authorities trying to uphold military jurisdiction have the burden of establishing such jurisdiction, the provisions of Article 2(d) of the Articles of War would be ineffective, if those authorities were required to prove the knowledge of the persons subjected to military law under that Article, that military law was applicable and that they were accompanying or serving with the army in the field. The history of the application of military law to civilians does not disclose an instance or a case in which there were indications that it was necessary to establish such knowledge in order to prove military jurisdiction over civilians. Congress did not say all persons knowingly acompanying or serving the army in the field." [McCune, supra, page 89.]

Jacob Berue, another merchant seaman, was hired at a union hall to serve on a ship operated under a General Agency Agreement. This vessel had been assigned by its owner, the War Shipping Administration, to the Army, although this allocation was unknown to Berue. On December 13, 1942, she sailed in a thirty-ship convoy from North Africa with one uniformed Army representative aboard—a "cargo security officer," whose duty it was to prevent larceny of or damage to the military cargo aboard. By reason of an incident which occurred during the voyage, Berue was tried by an Army court-martial sitting in Casablanca. In a subsequent habeas corpus proceeding, the jurisdiction of the military tribunal was upheld—again under Article of War 2(d). In re Berue, 54 F Supp 252 (SD Ohio). Here, too, the vessel—sailing through submarine-infested waters—was deemed to be "in the field." Also, the seaman was regarded as "accompanying" the Army, and the court pointed out:

". . . It has been stipulated that the Anthony Wayne had been assigned by the War Shipping Adminis-

---

[1] Under the Uniform Code of Military Justice, Article 85, 50 USC § 679, only a "member of the armed forces of the United States" may lawfully be tried for desertion.

tration to the army by letter of allocation, thus the vessel became at that time, to all intents and purposes, the property of the army; in more pertinent language, an army conveyance. Thereafter it was loaded exclusively with military supplies, at Pier 2, New York Port of Embarkation. Prior to departure, a General of the United States Army gave the Master detailed secret sailing orders in writing, specifically directing that after 8 p. m. on the following day, no officer or member of the crew should have shore leave. It is therefore apparent that the army having taken control of the vessel, loaded it with its own cargo, assumed control, through the Master, of both the ship and its personnel, adapting them to its purpose of secretly transporting its supplies to the specific area where they were needed. The direction that there should be no shore leave was an apparent recognition on the part of the army, that every man on board had potential ability to endanger the success of the enterprise.

"In the opinion of this Court, the facts and circumstances can lead to but one conclusion, and that is that the army was itself engaged in transporting by its own conveyance, its own supplies to the front.

. . . . . .

"This Court is of the opinion that the existence of jurisdiction cannot be defeated by lack of consent or lack of knowledge that such jurisdiction exists. Assuredly one who committed a crime without knowing that he was thereby subjected to the jurisdiction of a Federal Court, could not be heard to contest the jurisdiction upon that ground. It is proper, therefore, to determine the question of jurisdiction upon the facts and circumstances; it cannot rest upon knowledge or consent.

"Counsel for the petitioner in this case has urged that denial of the writ herein would result in subjecting possibly two hundred thousand merchant seamen to military law. If that be the result, this Court cannot assume the responsibility of attempting to reform the law as it is written. It may be said, however, that since the Congress has by a single act subjected several million men of military age to military law, without their consent, and at $50 per month, it is not unconscionable to subject two hundred thousand more men engaged in the war effort at a much higher wage, to the same law." [In re Berue, supra, pages 255–256. See also Fargione v. United States, 100 F Supp 239 (ED Pa).]

Two other cases dealing with the court-martial trials of merchant seamen throw little light on the present problem. In one it was held that no military jurisdiction existed to try a seaman for a homicide committed aboard a vessel operated by the Grace Lines for the War Shipping Administration. Hammond v. Squier, 51 F Supp 227 (WD Wash). However, the crime before the court there was committed in 1942— and prior to an amendment to the Articles for the Government of the Navy designed to confer a more extensive jurisdiction over civilians. Accordingly; the court refused explicitly to speculate concerning whether, under that amendment, a contrary result would have been demanded. The Government had conceded that, as of the date of the crime, trial by a military tribunal could only be supported under the laws of war.

Another crew member, serving on a vessel operated by the Grace Lines as a general agent for the United States, was tried by a special court-martial for having allegedly stolen an adding machine from an office of the French Navy in Tunisia. Question arose concerning the withholding from his pay of a fine assessed by the court-martial, and the issue was taken into a Federal civilian court. While concluding that the withholding of pay was unauthorized, the court in no manner suggested that initially the court-martial had lacked jurisdiction to impose the fine. Shilman v. United States, 164 F2d 649 (CA 2d Cir), cert den 333 US 837, 68 S Ct 608.

With reference to the McCune and Berue cases it must be conceded that the

case for military jurisdiction was substantially stronger there than found here. In the former a large contingent of troops was, in fact, aboard the vessel—and in the latter the ship on which the crime was committed was sailing as an integral part of a military convoy. It is clear that in each instance the court appears to have been influenced by the importance of our shipping to the support of American operations overseas, the hazards to which that shipping was exposed by reason of enemy action, and the need for absolute military discipline to protect against those risks.

While Robertson's delict occurred during the course of the recent Korean hostilities, American shipping was in no sense subject to attempts at enemy interference of the severity which characterized World War II—nor does the cargo of Provo Victory appear to have been destined for immediate combat operations. Too, the vessel is not shown to have carried military personnel, nor to have been sailing to Yokohama in convoy. Nonetheless, the prior cases point generally to the conclusion that the present accused was "accompanying" the Armed Forces while he was afloat as a part of the crew of the Provo Victory.

Especially significant is the view that it is not esential to military jurisdiction that a merchant seaman recognize the possibility that he may be subject to its terms, or consent thereto. Nothing whatever said in United States v. Garcia, supra, is inconsistent with these pronouncements. There, in dealing with the accused's stipulation, we pointed out that military jurisdiction was established by his voluntary act in agreeing to the existence of certain facts which, if true, would render him subject to the terms of the Uniform Code. This conclusion—as we expressly stated—did not reflect any sort of notion that consent by a civilian person to military jurisdiction was in any way indispensable. However, in light of the circumstance that Congress authorized military jurisdiction over civilians overseas to be predicated on "voluntary employment, a contractual relation," we felt that, after stipulating in detail to facts sufficient, if true, to establish jurisdiction, the accused should not on appeal be permitted to repudiate that stipulation.

In Garcia we quoted an opinion of The Judge Advocate General of the Army and noted: "This opinion of The Judge Advocate General is clearly entitled to weight. Hiatt v. Brown, 339 US 103, 94 L ed 691, 70 S Ct 495." The Judge Advocate General of the Navy has rendered the following opinion relevant to the problem at hand:

". . . Article 2(11) provides that all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States and without certain designated territories shall be subject to court-martial jurisdiction. The groups of vessels under operational control of MSTS are either government owned and operated by MSTS; MSTS tankers owned and controlled by the Navy but under operation by commercial steamship companies; privately owned vessels time-chartered to MSTS; Maritime Administration owned ships bareboat chartered to private shippers and in turn time-chartered to MSTS; and Maritime Administration vessels operated by NSA through General Agents and allocated to MSTS on a basis similar to time and voyage charter. It is clear that each of the above groups is integrated into the MSTS fleet as to detailed schedules, sailing orders and employment plans. Since MSTS has been established within the Department of Defense as a part of the Naval Operating Forces under the military command of the Chief of Naval Operations, in keeping with the consistent holdings of the Federal courts, it is clear that civilian personnel employed on vessels enumerated above fall into one of the broad categories of Article 2(11) of the Uniform Code of Military Justice, supra, and are therefore subject to court-martial jurisdiction whenever such vessels are operating 'without the continental limits of the United States and without the following territories: That part of Alaska east of longitude one hundred and seventy-two degrees west, the Canal Zone, the

**813**

main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands.' Those vessels owned by commercial steamship companies under voyage or space charter to MSTS are commercial vessels essentially under the control administration and operation of such companies. Civilian personnel employed on vessels owned by commercial steamship companies where such vessels incident to general business operations may have space or the entire vessel chartered for one voyage to MSTS are not, in the opinion of this office, so related to military command that court-martial jurisdiction would attach to such personnel. Should such vessels, so chartered, become an integral part of a task force engaged in a military operation, or by any other circumstance become subject to military control, it is the opinion of this office that such personnel would come within the provisions of Article 2(10) and 2(11) of the Uniform Code of Military Justice and be subject to court-martial jurisdiction. (Citing Perlstein v. United States, 151 F2d 167; McCune v. Kilpatrick, 53 F Supp 80; Re Berue, 54 F Supp 252; Re DiBartolo, 50 F Supp 929; Ex parte Falls, 251 F 415; 1918 Op JAG 79, 1 Bull. JAG (1942) 357; 1918 OP JAG 243; 1 Bull. JAG (1942) 12; 1 Bull. JAG (1940) 212; 1 Bull. JAG (1942) 357; 2 Bull. JAG (1943) 235.)" [Op JAGN 1952/109, 2 Dig Ops Courts-Martial § 47.1.]

Clearly the Provo Victory had been integrated into the Military Sea Transportation Service fleet.

In United States v. Redmond [CM 367789], 14 CMR 430, an Army board of review upheld military jurisdiction over a merchant seaman whose vessel had moved military cargo to Korea. The ship in question was then under time charter to the Military Sea Transportation Service, and "was carrying military cargo under the direction of the United States Army in logistical support of our armed forces in Korea." However, that accused had signed on as an ordinary seaman.

Even more closely in point is United States v. Patterson [CM 366499], 16 CMR 295. The accused in that case had been a seaman aboard the S. S. Beloit Victory, owned by the Maritime Administration, operated by Lykes Brothers Steamship Company as general agent for the National Shipping Authority, and allocated to the Military Sea Transportation Service. The cargo included military supplies, but no Armed Forces personnel were aboard during the voyage, and the accused was paid by the general agent. The jurisdiction of a court-martial was upheld. In light of the direction taken by these precedents and other authorities relating to military jurisdiction, we must conclude that Robertson would have been subject to trial by court-martial for any offense committed by him aboard ship.

IV

What change then was wrought in his status by the circumstance that he took shore leave in Yokohama?[2] Of

It may be argued that, if Federal precedents support military jurisdiction while the accused was aboard the Provo Victory, and also the notion that he would be subject to punishment by American civilian courts, he should at least be equally subject to *military* jurisdiction when the crime is committed in a locale within which our civilian courts totally lack jurisdiction. This argument would seem to proceed on the premise that it is desirable that *some* American court be empowered to deal with offenses committed by American Nationals overseas. This, in fact, was the *raison d'etre* of the consular courts which the United States and other nations once maintained in certain

[2] While Robertson was aboard the Provo Victory, and at sea, he was within the "special maritime and territorial jurisdiction of the United States," which would render him subject to trial—for at least certain offenses—by a Federal District Court. See 18 USC § 7. Once ashore in Japan, however, he would be subject to trial by a Federal civilian court only for crimes injurious to the United States —a category which would not include the instant homicide. United States v. Bowman, 260 US 94, 67 L ed 149, 43 S Ct 39. Thus, jurisdiction lay in a court-martial here, or in no American tribunal.

814

course, the brevity of the stay contemplated would serve to eliminate any possibility of termination of military jurisdiction by the accused's merger with the Japanese economy and population.[3] United States v. Garcia, supra. At this point, however, we must reckon with the Administrative Agreement which, at all relevant times, governed relations between the United States and Japan.

Article XVII of that Agreement provides that "the United States service courts and authorities shall ■ have the right to exercise within Japan exclusive jurisdiction over all offenses which may be committed in Japan by members of the United States armed forces, the civilian component, and their dependents, excluding their dependents who have only Japanese nationality. Such jurisdiction may in any case be waived by the United States." Paragraph 2. The "civilian component" is defined in Article I (b) as "civilian persons of United States nationality who are in the employ of, serving with, or accompanying the United States armed forces in Japan, but excludes persons who are ordinarily resident in Japan or who are mentioned in paragraph 1 of Article XIV. For the purposes of this Agreement only, dual nationals, United States and Japanese, who are brought to Japan by the United States shall be considered as United States nationals." As we noted in Garcia, paragraph 1 of Article XIV relates to certain civilian businessmen, but in no possible way to merchant seamen.

The definition of "civilian component" in the Agreement clearly parallels the wording in Article 2 (11), which delimits those overseas civilians who are subject to the Uniform Code. There are, however, certain minor divergences. For instance, the category of businessmen, expressly excluded from the component in the Agreement, might well have been deemed to fall within Article 2 (11)—and this would seem to have been the very point of the exception. See also Article XIV, paragraph 7. More important, the civilian component is defined in terms of American nationality. To be sure, "Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar." See Johnson v. Eisentrager, 339 US 763, 769, 94 L ed 1255, 70 S Ct 936. It is not an exclusive ground, however—for this Court has expressly determined that an alien serving with our Forces overseas would, in the absence of treaty, fall within the scope of Article 2 (11). United States v. Weiman, 3 USCMA 216, 11 CMR 216.

The defense in the present case has contended that the term "civilian component" was not meant to include merchant seamen not civil service employees of the Defense Department—of whom, they argue, Robertson was one. Indeed, Government appellate counsel—for a time at least—seem to have inclined toward a similar viewpoint. To support this contention, defense counsel at the trial introduced testimony to the effect that merchant seamen were generally excluded from post exchange or ships store facilities in Japan and were not permitted to make use of military payment certificates. On the other hand, however, it seems to have been gener-

---

countries. See Ross v. McIntyre, 140 US 453, 35 L ed 581, 11 S Ct 897.

[3] Foreign Service Dispatch No. 164 from Mr. Taylor, the Consul General in Yokohama, dated March 3, 1953, indicates that Robertson, like Garcia, would have been treated by the Japanese authorities as an illegal entrant, and thus clearly would never have been allowed to merge with the Japanese populace and economy.

This same Dispatch reveals that a substantial problem was created in Yokohama by the presence there of numerous seamen who had failed to rejoin their ships—"with a resultant increase in the number and seriousness of misconduct problems and violations of law and order over which the Japanese authorities are denied jurisdiction or control." It can be inferred from the Dispatch, as well as from other information, that American authorities in Japan, the Department of State, and the Japanese nation entertained divergent views with respect to the proper handling of this problem, and the agencies which possessed jurisdiction over these seamen.

ally accepted in Japan that members of the "civilian component" would have been entitled both to the use of military payment certificates and to access to post exchange and like facilities.

Moreover, the defense called to the court-martial's attention Circular No. 8, promulgated on May 16, 1952, by Headquarters, Far East Command, and dealing with the exit from and entry into Japan of individuals, cargo, aircraft, and surface vessels of the United States Forces. Paragraph 3a(2) of that document purports to define "United States Forces personnel," one category of which is the "civilian component." This phrase, in turn, "includes the following:"

"(b) Civilian employees on United States Forces operated vessels and aircraft. (This excludes contract operated, chartered, and General Agency Agreement vessels.)"

Subsequently in paragraph 3b "United States Forces vessels and aircraft" are defined as "vessels and aircraft under the operational control of the United States Forces," which "includes:"

"(1) United States Forces operated vessels and aircraft (commissioned Navy, Army, and Coast Guard ships; Civil Service manned Military Sea Transportation Service ships, United States Air Forces, Military Air Transport Service, Navy, Marine, Coast Guard, and Army aircraft). These vessels and aircraft will normally carry only United States Forces cargo, passengers, and crewmen, except for a limited number of non-United States nationality Civil Service crewmen and foreign Naval personnel.

"(2) United States Forces controlled vessels and aircraft (contract operated, time chartered, General Agency Agreement ships, ships assigned to the United States Forces by a foreign country and chartered aircraft, but not including voyage or space charter). These vessels and aircraft will normally carry only United States Forces cargo, but crewmen, except for a limited number of United States Naval or Air Force crewmen, will be non-United States Forces personnel."

This circular—issued by the highest American military authority of the Far East—manifestly views merchant seamen, of the style of Robertson, as falling outside the "civilian component." This is clear from the definition of that term found in paragraph 3a, and as well from the statement in 3b to the effect that crewmen on vessels and aircraft controlled by the United States Forces —which includes General Agency Agreement vessels—will, for the most part, "be non-United States Forces personnel." The latter category certainly does not include members of the civilian component.

Circular No. 8 makes provision for the issuance of special landing permits to crewmen of United States Forces controlled vessels—but in their issuance certain discretion seems to reside in the Japanese immigration authorities. Since, under Article IX of the Administrative Agreement, the United States may, in the service of the purposes of the Agreement, introduce into Japan members of the civilian component, the possession of admissive discretion by the local immigration authorities suggest strongly that these crewmen are not part of the civilian component. Also, under this Circular, Japanese immigration authorities handle the deportation of crewmen from United States controlled vessels, although they "will turn over to the United States authorities for appropriate action, all crewmen over which the United States has jurisdiction, if apprehended for the commission of an offense." However, under Article XVII, paragraph 3(f), "The United States armed forces shall have the exclusive right of removing from Japan members of the United States armed forces, the civilian component, and their dependents."[4] If Japanese officials are charged with the removal from Japan

---

[4] This provision appears to reflect an assumption that although the crewman may have enjoyed no right to be in Japan—and thus might not be a member of the civilian component— he might nevertheless be subject to American jurisdiction for an offense committed in Japan.

of merchant seamen who ship on General Agency Agreement vessels—like Robertson, the accused in the present case—then it may be said to follow that these seamen constitute no part of the civilian component.

The attention of the court-martial was also directed to Circular No. 9, Law Enforcement Procedures in Japan, which was issued on May 20, 1952, by the same Headquarters. Here it is noted that "Members of the United States Forces, Japan, are in Japan today at the request of the Japanese Government in accordance with the Security Treaty between the United States of America and Japan." Paragraph 7a. The document additionally points out that, under the Administrative Agreement, the United States possesses exclusive jurisdiction over offenses committed by members of the United States Forces, Japan —this grant of jurisdiction constituting, of course, a *quid pro quo* tendered by the Japanese as a part of their invitation to the United States to aid in the protection of the former nation. Paragraph 8a. These United States Forces are defined so as to include the "civilian component," which signifies "Civilian persons of United States nationality who are in the employ of, serving with, or accompanying the United States Forces, Japan, excluding those persons who are ordinarily resident in Japan and contractual persons." Paragraph 6a (2). Unlike Circular No. 8, this directive attempts no further delimitation of this category.

In attempting still further to explore the import of the phrase, "civilian component," we have examined the deliberations of the Joint Committee established by the United States and Japan, pursuant to Article XXVI of the Administrative Agreement—which agency was designed to render aid through an implementation of that compact. Here we discover that, by action of May 23, 1952, as amended on December 3, 1952 —action taken in accordance with the recommendations of a Subcommittee on Jurisdiction—a procedure was established for the entry and exit of crewmen to and from Japan, which parallels that of Circular No. 8. While no express definition of "civilian component" was at-

tempted at the time, it seems quite clear that crewmen on "United States Forces Controlled Vessels" were regarded as falling outside the component. It also appears that, under this implementive directive, the Japanese immigration authorities were assigned the function of determining whether such individuals should receive shore passes—and their deportation in proper cases would likewise constitute a responsibility of the Japanese. However, the latter "shall turn over to the United States authorities for appropriate action, all crewmen over which the United States has jurisdiction, if apprehended for the commission of an offense." This latter phraseology is identical with that of Circular No. 8—and, for this and other reasons, it is unmistakable that this document was in a substantial sense a product of the Joint Committee's deliberations. Therefore, since the Joint Committee was established and empowered by the Administrative Agreement, Circular No. 8 may safely be read into that concord.

We note with interest other deliberations of this Committee—in particular those of October 22, 1953. See Minutes of 74th Meeting of the Joint Committee, page 80. At that time it was stated that the definition of "civilian component" appearing in certain Japanese legislation includes "all members of the crews of vessels under time charter to the United States Government or its agencies." Undoubtedly the term, "civilian component," as used in the statute concerned, was intended to reflect the phraseology of the Administrative Agreement, and should thus be construed in accordance with the intendment of that Agreement. Yet here the interpretation seems to differ from that utilized in connection with the establishment of entry and exit procedures.

Although the Provo Victory was not under written charter to the Military Sea Transportation Service, we are sure that the vessel must be assimilated to a ship under time charter, rather than to one under voyage or space charter. Indeed, the close Government control over a General Agency Agreement vessel—a control which clearly underlay the several Supreme Court decisions ad-

**817**

verted to earlier and involving the Jones Act—would necessitate such an assimilation. It would follow then that, if the construction of "civilian component" used by the Joint Committee in October 1953 is to be our guide, we will be required to conclude that Robertson falls within that category. If, conversely, we are to adopt the interpretation which appears to have been in the minds of the Joint Committee in May 1952— as well as that of the draftsmen of Circular No. 8—he will not be so included.

Where does all of this leave us? The Navy Board of Review in the case at bar concluded from its consideration of Circulars Nos. 8 and 9 that "for different purposes the Headquarters, Far East Command, promulgated different and administratively appropriate definitions of 'civilian component' as used in the Administrative Agreement." We can readily understand this interpretation. For different purposes it might indeed be desirable to have different interpretations of this component. For instance, currency control might well present problems distinct from those of criminal jurisdiction. Nonetheless, the Agreement itself utilized but a single definition of the term in question, although it caused a wide variety of consequences to hinge on placement within that component. We doubt that it was there intended that the phrase should possess a meaning calculated to shift with the question involved. Indeed, to conclude to this effect virtually

would be to find that the framers of the Agreement intended to condemn its administration to utter chaos. We are, therefore, reluctant to assume that the adoption of the Joint Committee of variable interpretations of the term, "civilian component," was authorized or even contemplated by the Agreement.

Giving due weight, therefore, to Circular No. 8, and to testimony concerning the practices in Japan with respect to such a one's access to military payment and post exchange privileges, we feel more than reasonably sure that the more general understanding of the Administrative Agreement must be that Robertson fell *without* the "civilian component." Therefore, we shall proceed from the premise that the accused was not a member of this group.

## V

The Administrative Agreement provides that the United States shall exercise *exclusive* jurisdiction over members of the American civilian component in Japan. In a sense, this constitutes a grant to the United States of something closely akin to extraterritorial rights. Extraterritoriality has long been known to the law and, in fact, was at an earlier time exercised by United States consular courts over Americans in Japan. See Ross v. McIntyre, 140 US 453, 35 L ed 581, 11 S Ct 897.[5] However, markedly it has lost favor in recent years, and frequent-

---

[5] That case concerned a British subject who had signed on an American ship and had been tried by an American consular court for an offense committed aboard ship in the Yokohama harbor. Suggestive even today are the following comments by the Supreme Court in upholding the extraterritorial jurisdiction of that American tribunal:

"The practice of European governments to send officers to reside in foreign countries, authorized to exercise a limited jurisdiction over vessels and seamen of their country, to watch the interests of their countrymen and to assist in adjusting their disputes and protecting their commerce, goes back to a very early period, even preceding what are termed the Middle Ages. During

those ages these commercial magistrates, generally designated as consuls, possessed to some extent a representative character, sometimes discharging judicial and diplomatic functions. In other than Christian countries they were, by treaty stipulations, usually clothed with authority to hear complaints against their countrymen and to sit in judgment upon them when charged with public offenses. After the rise of Islamism, and the spread of its followers over eastern Asia and other countries bordering on the Mediterranean, the exercise of this judicial authority became a matter of great concern. The intense hostility of the people of Moslem faith to all other sects, and particularly to Christians, affected all their inter-

ly is resented by the nation conceding extraterritorial rights.

A type of extraterritoriality was embodied in the doctrine of the famous Schooner Exchange case, reported in 7 Cranch 116 (US 1812). There, Chief Justice Marshall stated that a visiting Army is immune from the jurisdiction of a friendly sovereign through whose realm its troops pass. See also United States v. Weiman, 3 USCMA 216, 11 CMR 216. However, some international lawyers—both in this country and abroad—have expressed grave doubt that this pronouncement constitutes a correct statement of international law. Consequently not a few of the countries in which American Forces have been stationed have asserted jurisdiction over these troops, retainers and employees—especially with respect to offenses against the local populace. The NATO Status of Forces Agreement today provides specifically for such an exercise of jurisdiction over American personnel by the courts of the country in which our military forces are stationed.

In light of the history of extraterritoriality, it may well be deemed more nearly suitable to the intendment of the contracting parties that the Administrative Agreement between the United States and Japan be construed narrowly—particularly insofar as the grant of *exclusive* jurisdiction is concerned. This, in turn, would imply a narrow construction of the phrase, "civilian component." Certainly an interpretation of the term which excluded therefrom merchant seamen—like the accused in the case at bar—would not, we think, defeat the basic purposes of the Administrative Agreement. For instance, we suspect that no important purpose of the United States would have been impaired had Robertson been refused permission to land in Japan.

We are sure, though, that there is no policy—with a single conceivable exception—which would require a limiting construction of American *concurrent* jurisdiction, that is, one shared with Japan. Of course, the exception suggested has to do with persons who are citizens of, or ordinarily resident in, Japan—and it is manifest that the present accused does not fall within this category. In short, we find noth-

course, and all proceedings had in their tribunals. Even the rules of evidence adopted by them placed those of different faith on unequal grounds in any controversy with them. For this cause, and by reason of the barbarous and cruel punishments inflicted in those countries, and the frequent use of torture to enforce confession from parties accused, it was a matter of deep interest to Christian governments to withdraw the trial of their subjects, when charged with the commission of a public offence, from the arbitrary and despotic action of the local officials. Treaties conferring such jurisdiction upon these consuls were essential to the peaceful residence of Christians within those countries and the successful prosecution of commerce with their people.

. . . . .

"We have not overlooked the objection repeatedly made and earnestly pressed by counsel, that the consular tribunal is a court of limited jurisdiction. It is undoubtedly a court of that character, limited by the treaty and the statutes passed to carry it into effect, and its jurisdiction cannot be extended beyond their legitimate meaning. But their construction is not, therefore, to be so restricted as to practically defeat the purposes to be accomplished by the treaty, but rather so as to give it full operation, in order that it may not be a vain and nugatory act.

"It is true that the occasion for consular tribunals in Japan may hereafter be less than at present, as every year that country progresses in civilization and in the assimilation of its system of judicial procedure to that of Christian countries, as well as in the improvement of its penal statutes; but the system of consular tribunals which have a general similarity in their main provisions, is of the highest importance, and their establishment in other than Christian countries, where our people may desire to go in pursuit of commerce, will often be essential for the protection of their persons and property." [Ross v. McIntyre, supra, at pages 462 and 479.]

ing in the Agreement which would serve to defeat military jurisdiction over Robertson—although he is probably no part of the civilian component—if under the Uniform Code that jurisdiction may be said otherwise to exist. Indeed, with reference to one group—businessmen covered by Article XIV—the possibility of concurrent jurisdiction appears to be recognized expressly in the Agreement. See Article XIV, paragraph 7.

Since the definition of "civilian component" parallels largely the language found in Article 2(11) of the Code with respect to those persons subject to American military justice, the draftsmen of the Administrative Agreement may have envisaged little likelihood that there would be a substantial number of persons who, although not members of the component, would be triable by American courts-martial for offenses committed in Japan. However, the Agreement involves the wishes and interests of Japan as well, and it is understandable that this foreign Power might well take a view of "civilian component" divergent from American interpretations of persons falling within the language of Article 2(11). We doubt that Japan bound herself to accept *every* interpretation of the Uniform Code made by American courts. Instead, it appears to have been envisaged that the Joint Committee—in its implementation of the Agreement—would resolve any issue which might arise regarding such matters as the composition of the civilian component. Too, normal diplomatic channels would be available for this purpose.

However, save as to persons who may have enjoyed some special bond with Japan, that nation would have no interest whatever in limiting the jurisdiction which might otherwise be possessed by American courts—military or civilian. Thus, no reason would exist for the Administrative Agreement to contemplate that American courts, in interpreting the Code, would be bound to accept for jurisdictional purposes the determinations of the Joint Committee, or those made by diplomatic authorities, with respect to the civilian component's

membership. Therefore, with an eye to the purposes of this compact, we conclude that it did not remove the present accused from the operation of military jurisdiction at the moment he stepped ashore from the Provo Victory and by reason of the fact that he had done so. Of course, had he failed to rejoin his ship and elected to remain in Japan over a substantial period, Robertson might at some point have left the ambit of military jurisdiction as defined in Article 2(11)—but we are sure that, at the time of the homicide, he remained subject to the provisions of the Uniform Code.

We are remanded then to the normal rules governing concurrent jurisdiction. Since Japanese authorities had arrested Robertson initially, and thereafter surrendered him to American officials, under those rules the former relinquished all right to proceed first against him. Of course, the rules of former jeopardy—inapplicable between separate sovereignties—would not prevent a subsequent Japanese trial—regardless of the action of a court-martial. Under the circumstances then, we hold that the accused's motion to dismiss the charge laid against him was properly denied.

VI

We move now to the issue of whether the law officer erred in failing to instruct on the lesser included offense of involuntary manslaughter. The accused's military defense counsel—an officer who represented him with notable competence during the trial, as appellate counsel have done subsequently—expressly requested such an instruction. If the evidence reasonably raised the lesser offense, it is undeniable that refusal of the request must be deemed to constitute prejudicial error. United States v. Clark, 1 USCMA 201, 2 CMR 107; United States v. Baguex, 2 USCMA 306, 8 CMR 106.

The testimony reveals that the accused and his victim, Miller, were shipmates on the Provo Victory, and had served there together quite without incident. One fellow crewman, indeed, characterized the pair as "pretty good

buddies." On the day of the homicide they had, at one point, appeared to be entirely friendly and were talking and laughing together. It is evident that both had consumed substantial quantities of intoxicating liquor. At the trial the accused testified that he had only meant to strike Miller on the shoulder, and had not wished to injure, much less to kill, him. This same version was reported by Robertson in the course of a pretrial statement made to military investigators—which statement was introduced by the Government in evidence.

The several Japanese witnesses who observed the incident testified that the accused struck Miller with a stick approximately one meter long and three centimeters thick—which is to say, some three feet in length and one and one-quarter inches in diameter. Indeed, no testimonial estimate of the stick's thickness exceeded one and one-half inches. It is undeniable that the fatal result of its use may well have been attributable to the unusually delicate nature of Miller's skull, which medical evidence reveals to have been "remarkably thin" and "remarkably like the skull of a female." It is recognized, of course, that the latter's physical condition can exercise no effect on the accused's amenability to the criminal law—that is, his responsibility for homicide in *some* degree. However, it is elementary that bodily insufficiency may—as a factual matter—throw light on the question of whether an intent to kill or inflict great bodily harm existed, or whether, on the other hand, the death amounted to no more than an accident unanticipated by the actor. Thus, it may possess distinct relevance to a determination of the particular homicide offense for which he is answerable. Cf. Uniform Code, Articles 118(2) and 119(b)(1).

On the basis of the Government's evidence alone—and especially on that of the accused's pretrial statement—the offense of involuntary manslaughter seems to us to have been raised reasonably. When to this is added the testimony of the accused, with its emphatic denial of any sort of purpose to kill or grievously to injure Miller, we must conclude that the present conviction of murder cannot be affirmed. As we see it, the case is a close one, and doubts must be resolved against the law officer's reticence.

VII

Accordingly, the record of trial is remanded to The Judge Advocate General, United States, Navy, for further proceedings not inconsistent with this opinion.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring):

I concur.

I concur with Judge Brosman on the issue of jurisdiction in this case. Further, I believe that involuntary manslaughter was raised as an issue and that instructions should have been given on that subject. However, I base my instructional views upon reasons which are not fully set forth in his opinion.

The principal opinion seems to suggest that because the victim in this case had a "remarkably thin" skull, that condition could be considered a factor tending to raise involuntary manslaughter. In my view, the underlying physical condition of a victim is not involved in determining whether the offense committed was murder or involuntary manslaughter. As a general proposition, I believe that if the victim of an assault is of poor health, such physical condition is no defense to an accused charged with murder. To support my premise, I submit the following authorities. 26 Am Jur, Homicide, §§ 48, 52, pages 191, 195, states the rule in the following language:

". . . Criminal responsibility for inflicting an injury which is the efficient cause of death is not lessened merely because of the predisposed physical condition of the decedent, without which the blow or wound would not have been fatal."

The following quotation from 40 CJS, Homicide, § 11, page 856, is to the same effect:

". . . Thus if deceased was diseased or in feeble health and died

**821**

from the combined effects of the injury and of his physical condition, or if the injury accelerated the death from his physical condition, he who inflicted the injury is liable, although the injury alone would not have been fatal had deceased been well."

The rationale of that general principle has been elaborated in many decided cases. In State v. Smith, 73 Iowa 32, 34 NW 597, 601 (1887), it was shown that the wounds found upon the body of the deceased and inflicted upon her by the feet and fists of the accused were not sufficient to cause her death without other concurrent causes, which were disease of the heart and a state of intoxication. The court held:

". . . It surely ought not to be the law that because a person is afflicted with a mortal malady, from which he must soon die, whether his ailment be caused by natural or artificial causes, another may be excused for acts of violence which hasten or contribute to or cause death sooner than it would otherwise occur. Life at best is but of short duration, and one who causes death ought not to be excused for his act because his victim was soon to die from other causes, whatever they may be, and in the case at bar we think the jury were warranted in finding that the violence of the defendant contributed to or caused or accelerated the death of his wife."

In Nelson v. State, 58 Ga App 243, 198 SE 305, 308 (1938), the accused inflicted a severe beating upon his wife which accelerated her death. It was shown that she was suffering from uremic poisoning and would have survived the acts of violence done by the accused had it not been for the disease under which she labored. Although the conviction was reversed for other reasons, the court, in the course of its opinion, said:

". . . If one be afflicted with a mortal disease, and receives a wound, although itself not mortal, but which hastens or accelerates death, the party inflicting the wound will be accountable for his death. Every man (woman), from the time of his birth, is hastening to his death, and, in a sense, he is born and lives with mortal infirmities, or wounds or diseases, or by whatever name you choose to call his deteriorating vitality, for the workings of the laws of nature are inevitably carrying or hastening him to his death, and no murder does more than to hasten his death or bring it about sooner than the laws of nature would themselves have brought it about if there had been no interference by criminal agency. . . . In such case . . . the wound hastens death and the offender can not apportion his wrong."

The following cases support the same general rule. The underlying physical condition contributing to the death is indicated within parentheses and in each case the harm done by the accused would not have been fatal in the absence of the disease or weakened physical condition: Rutledge v. State, 41 Ariz 48, 15 P2d 255 (1932) (beating a senile woman of 85 who was of delicate health); Tucker v. Commonwealth, 303 Ky 864, 199 SW2d 631 (1947) (striking a man of 67, who was suffering from hardening of the arteries, over the head with a barrel stave); Huckabee v. State, 159 Ala 45, 48 So 796 (1909) (inflicting a knife cut $\frac{1}{4}$ inches deep and 3 inches long on the deceased, who was a bleeder); Hopkins v. Commonwealth, 117 Ky 941, 80 SW 156 (1904) (inflicting a minor wound by shooting a victim who was in the second stage of consumption); and Griffin v. State, 40 Tex Crim 312, 50 SW 366 (1899) (a skull fracture inflicted with a beer glass upon a victim who was suffering from a brain inflammation). Furthermore, it is not material that the accused did not know, and could not know, from physical appearances, of the weakened condition of the victim. Cunningham v. People, 195 Ill 550, 63 NE 517, 525 (1902).

The majority opinion also places reliance upon the testimony of the accused to the effect that he had no intent to kill or injure grievously the victim as tending to raise the lesser offense. If that statement was standing alone, I might consider it of little importance to an instructional issue, as "A sane

person may be presumed to have intended the natural and probable consequences of acts shown to have been intentionally committed by him." Manual for Courts-Martial, United States, 1951, paragraph 138a, page 240. Unpremeditated murder does not require a specific intent, United States v. Roman, 1 USCMA 244, 2 CMR 150; United States v. Craig, 2 USCMA 650, 10 CMR 148, and thus "if a person does an intentional act likely to result in death or great bodily harm, he may be presumed to have intended death or great bodily harm." Manual for Courts-Martial, supra, paragraph 197e, page 352. Apparently that concept was embodied in the theory under which the prosecution proceeded, but when we are asked to judge the conduct of an accused by an objective standard, we must apply the test to his credible testimony—and not to the Government's unless it supports the defense theory—in determining whether an instructional issue was raised. One way to attack this theory of the prosecution is to show that the act which resulted in death, in this instance the hitting on the head, was not intentionally done. Here the accused testified that he did not intend to strike the victim on the head, but only on the shoulder. He claims the victim was the aggressor in a pugilistic encounter and that he intended only to discourage any further belligerency. Pretermitting self-defense, his version presents an intent to strike in a non-vulnerable area, and the weapon used was not such as to compel a finding that, when applied to the shoulder, serious injuries might reasonably be anticipated. Thus, if his story is believed, the natural and probable consequences of his act would not result in death or serious bodily injury. True, death did follow, but that result does not preclude a finding to the effect that it was not the natural and probable consequence of the act intentionally committed by the accused.

Obviously, the argument previously advanced would be defeated if the weapon was of such a deadly character that, when applied to any part of the body, grievous bodily harm was a likely result. Here, the facts disclose the weapon was a stick 40 inches long and 1¼ inches in diameter. It was not per se a dangerous weapon, and so its manner of use determines its potentialities for injuring seriously. The decided cases, in similar factual situations, indicate that the jury should be permitted to resolve that question.

In People v. Cook, 15 Cal2d 507, 102 P2d 752, 757 (1940), the accused struck his victim, a young woman, over the head with a "piece of two-by-four about two feet long," thereby inflicting the injury which caused her death. The court declined to say that such an instrument is inherently dangerous or deadly, and held:

". . . Therefore, under all the facts and circumstances of the instant case the questions of the nature of the weapon and the manner of its use in their relation to the crime committed were for the determination of the jury."

In Winter v. State, 123 Ala 1, 26 So 949 (1899), the accused, during the course of a fight, struck the victim over the head with a "green" pliable oak stick, which was 40 inches long and 2 inches in circumference. The encounter took place on an extremely warm day, and the victim's death resulted from the fact that he was drunk and overheated, as well as from the fact that the accused struck him. It was there held that the question of whether the weapon used could be characterized as being deadly was a question for the jury and and that the trial court did not err in refusing to charge that such a stick could not be a deadly weapon.

I believe the principles found in the foregoing quotations are sound, and when I apply them here I am unwilling to say that this weapon was dangerous per se. I also conclude that, although the court-martial could have found as a matter of fact that the manner in which the stick was used in this case made it a dangerous weapon and, therefore, grievous bodily harm was a likely result of its use, I cannot say that reasonable men might not reach a contrary conclusion.

Having concluded that unpremedi-

tated murder might not be the sole offense in issue, I drop down the scale to show why, specifically, involuntary manslaughter was raised. Article 119 (b), Uniform Code of Military Justice, 50 USC § 713, defines involuntary manslaughter as follows:

"Any person subject to this code who, without an intent to kill or inflict great bodily harm, unlawfully kills a human being—

(1) by culpable negligence; or

(2) while perpetrating or attempting to perpetrate an offense, . . . directly affecting the person;

is guilty of involuntary manslaughter. . . ."

If the evidence in the record raises reasonably either theory set out in the Article, then an instruction was required. Without reference to subsection (1), I am convinced the testimony of the accused would permit a finding that this death occurred during the course of an offense against the person of the victim.

The Manual, supra (paragraph 198b, pages 355), notes that:

". . . Among offenses directly affecting the person are the various types of assault, battery, false imprisonment, voluntary engagement in an affray, the use of more force than is reasonably necessary in the suppression of a mutiny or riot, and maiming."

Here, there was a physical encounter and although accused contended he did no more than defend himself, there was other evidence that the victim attempted to retire from the scene prior to the time when the accused obtained the stick. I need not enter the collateral areas of dispute as absent self-defense the facts show either an assault and battery or a voluntary affray. The issue of self-defense was submitted to and considered by the court-martial and its finding removes that issue from consideration here.

It necessarily follows from what I have stated that the issue of involuntary manslaughter was raised, and appropriate instructions should have been given on that lesser offense.